UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | |
|---|---|
| The American Association for Disability Justice ("AADJ"), on behalf of its members and all others similarly situated; Larry Miller on behalf of the Estate of John Miller; and John Hodges; individually and on behalf of all others similarly situated.<br>Plaintiff,<br>vs.<br><br>Epic Systems Corporation, and their affiliates, subsidiaries, and parent companies.<br>Defendant. | Case No.: 1:26-cv-564<br><br>CLASS ACTION COMPLAINT<br>DEMAND FOR JURY TRIAL |

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, The American Association for Disability Justice ("AADJ"), on behalf of its

members and all others similarly situated; Larry Miller on behalf of the estate of John Miller; and

John Hodges, individually and on behalf of all others similarly situated.  alleges the following

against Defendant, Epic Systems Corporation ("Epic"), based upon personal knowledge as to

Plaintiff and upon information and belief as to all other matters.

**TABLE OF CONTENTS**

I. Introduction ……………………………………………………………………..4

II. Parties ………………………………………………………………………..8

    A. Individual Plaintiffs…………………………………………………………..8

    B. Associational Plaintiffs………………………………………………….......10

    C. Defendant……………………………………………………………...11

III. Jurisdiction and Venue…………………………………………………………11

    A. Subject Matter Jurisdiction……………………………………………………11

    B. Interstate Commerce………………………………………………………..12

    C. Personal Jurisdiction………………………………………………………13

    D. Venue……………………………………………………………………13

IV. Factual Allegations…………………………………………………………..14

    A. Epic's Rise to Dominance in the Hospital EHR Market…………………………..14

    B. Epic's Network Effects and Hospital Lock-In Entrench Its Monopoly………………16

    C. Epic's Control Over Interoperability Infrastructure…………………………………17

    D. Epic's Opposition to Interoperability…………………………………………18

    E. Epic Creates Technological Barriers to Interoperability………………………21

    F. The Social Security Disability Determination Process Relies on Medical Records…...23

    G. Epic Knew That Access to Medical Records Is Critical to Disability Determinations..26

    H. Epic's MyChart Architecture Foreseeably Harms Disabled Individuals………………28

    I. Plaintiff Experiences Demonstrate the Real-World Consequences of Epic's Conduct…31

    J. AADJ Developed an Interoperable Portal to Improve Medical Record Access………..35

    K. Epic's Architecture Prevents Independent Interoperability Portals…………………...37

    L. Relevant Market……………………………………………………………38

M. Anti-Competitive Conduct………………………………………………………42

N. Anti-Trust Injury…………………………………………………………………46

P. Epic Cannot Invoke Regulatory Exceptions to Justify Its Conduct………………47

V. Associational Standing…………………………………………………………..50

VI. Class Allegation………………………………………………………………...51

VII. Causes of Action………………………………………………………………54

   Count I – Monopolization: Violation of Section 2 of the Sherman Act………………54

   Count II – Attempted Monopolization: Violation of Section 2 of the Sherman Act….55

   Count III – Unlawful Maintenance of Monopoly Power: Violation of Section 2 of the Sherman

Act…………………………………………………………………………………...56

   Count IV – Monopolization: Violation of the Texas Free Enterprise and Antitrust Act.57

   Count V – Attempted Monopolization: Violation of the Texas Free Enterprise and Antitrust

Act…………………………………………………………………………………58

   Count VI – Denial of Access to an Essential Facility: Violation of Section 2 of the Sherman

Act…………………………………………………………………………………59

   Count VII – Violation of the Americans with Disabilities Act…………………………60

   Count VIII – Violation of Section 504 of the Rehabilitation Act………………………61

   Count IX – Information Blocking in Violation of the 21st Century Cures Act…………62

VIII. Prayer for Relief………………………………………………………………..63

IX. Jury Demand……………………………………………………………………64

X. Conclusion………………………………………………………………………..64

# I. INTRODUCTION

1. This case is about electronic health records ("EHR"), interoperability, and Epic Systems Corporation's ("Epic") monopolistic and gatekeeping practices and the direct harm it causes disabled individuals and their family members.

2. This action challenges systemic barriers in EHR interoperability that directly prevent disabled individuals from obtaining complete electronic medical records necessary to pursue Social Security Disability benefits, other governmental and public benefits, and for urgent medical treatment and diagnosis.

3. Congress recognized the importance of individual access to health data and has enacted multiple laws which prohibit "information blocking". Information blocking is any practice that interferes with the access, exchange, or use of electronic health information.

4. In 2009, Congress enacted the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), Pub. L. No. 111-5, 123 Stat. 115 (2009). The HITECH Act sought to accelerate adoption of electronic health records while ensuring that those systems supported the secure exchange of medical information.

5. Congress empowered the Office of the National Coordinator for Health Information Technology ("ONC") to develop nationwide interoperability standards and certification requirements for EHR technology.

6. Congress also authorized billions of dollars in incentive payments encouraging healthcare providers to adopt EHR systems capable of exchanging medical data electronically.

7. These programs, including the Meaningful Use program administered by the Centers for Medicare and Medicaid Services, ("CMS"), required providers to use EHR systems that supported the electronic exchange of patient health information.

8. Congress enacted these measures to ensure that patients could access their medical records and that healthcare providers could exchange health information efficiently across institutions.

9. Congress found that certain EHR vendors were imposing technical, contractual, and financial barriers that prevented patients and third parties from accessing medical records electronically. These information blocking practices undermined the national interoperability framework and prevented patients from accessing their own health information.

10. In response, Congress enacted the 21st Century Cures Act ("Cures Act"), Pub. L. No. 114-255, 130 Stat. 1033 (2016) in response. The Cures Act created a federal prohibition on information blocking, defined as practices that are likely to interfere with, prevent, or materially discourage access, exchange, or use of electronic health information.

11. Congress directed the Department of Health and Human Services to implement regulations prohibiting such conduct.

12. Congress specifically required certified health information technology developers to support standardized application programming interfaces ("APIs") that allow patients and authorized third-party applications to retrieve electronic health information.

13. Congress further emphasized that patients must be able to access their medical records electronically and that technology vendors should not impose unreasonable barriers to such access.

14. In 2020, ONC issued its Final Rule 85 FR 25642 implementing the Cures Act's information blocking provisions, establishing detailed requirements for health

information technology developers, healthcare providers, and health information networks.

15. The rules in the Cures Act went into effect on April 5, 2021, with a limited definition of electronic health information. On October 6, 2022, the Cures Act rule expanded to include all electronic health information and required health IT developers must adopt APIs and EHR export functionalities within their systems.

16. On December 12, 2023, ONC developed the Trusted Exchange Framework and Common Agreement ("TEFCA"). TEFCA established a nationwide "network-of-networks" designed to allow health information to flow across health systems regardless of which EHR vendor a provider uses.

17. Under TEFCA, participating entities operate as Qualified Health Information Networks ("QHINs") responsible for facilitating nationwide data exchange. On December 12, 2023, Epic became one of the first five participating QHINS.

18. The purpose of TEFCA is to ensure that patients and authorized third parties can obtain medical records electronically without being limited by proprietary EHR systems.

19. The consequences of these barriers are not abstract. They affect real people whose ability to document their disabilities depends on timely access to complete medical records.

20. The experience of John Hodges illustrates precisely the type of harm the federal interoperability framework was designed to prevent. When electronic medical records cannot be accessed or aggregated because of information-blocking practices, disability claimants are unable to present their full medical records required for fair adjudication of their disability claims.

21. John was a successful small business owner until a series of heart attacks left him unable to work. As his health declined, John applied for Social Security disability benefits. To support his application, he needed medical records from multiple hospitals and specialists who had treated him over the years.

22. The intentionally complicated medical records retrieval process meant that John was unable to set up and navigate multiple MyChart portals to access a complete set of his medical records. Instead of seamless electronic access, John was forced to rely on social security to obtain his medical records and wait for responses from individual providers.

23. The delays had devastating consequences. Without timely access to the records needed to support his disability claim, John's application process was prolonged for months. During that time, he lost his primary source of income, became homeless, and ultimately lost custody of his daughter while waiting for the disability determination process to run its course.

24. John's experience is not unique. Across the United States, millions of disabled individuals depend on timely access to their medical records in order to obtain medical care, coordinate treatment among providers, apply for disability benefits, and make critical health decisions.

25. While Epic became one of the first QHINS and has publicly portrayed itself as a supporter of interoperability and nationwide health information exchange, Epic's conduct tells a different story. Rather than enabling open interoperability, Epic has used its control over electronic health records, and its dominant role within emerging interoperability frameworks to restrict how medical data can be accessed and exchanged.

26. Epic frequently justifies these restrictions by invoking patient privacy concerns. While protecting patient privacy is critically important, federal interoperability frameworks already include robust safeguards designed to protect patient information while allowing authorized data exchange. Epic's privacy arguments therefore function not as legitimate safeguards, but as a mechanism for controlling the flow of health information and maintaining its monopolistic advantage.

27. Plaintiffs bring this action to challenge Epic's conduct and to ensure that disabled individuals can obtain the medical records that federal law was designed to make accessible.

---

## III. PARTIES

### A. Individual Plaintiffs

28. Plaintiff Larry Miller, a resident of Austin, Texas, brings this action on behalf of his deceased son, John Miller, and on behalf of a proposed class of similarly situated individuals.

29. John Miller was a resident of Austin, Texas who suffered severe complications related to diabetes mellitus, including circulatory infections requiring partial amputations of portions of his feet and visual impairments associated with diabetic retinopathy.

30. Prior to becoming disabled, John Miller worked as a car salesman. As his diabetes worsened, he experienced episodes of dizziness and fainting caused by uncontrolled blood glucose levels and ultimately fainted at work, forcing him to stop working.

31. John Miller subsequently applied for Social Security disability benefits, but his claim was denied twice for insufficient medical evidence.

32. During the relevant period, John Miller experienced periods of homelessness and primarily received treatment through emergency departments and a low-income clinic, Sandra Community Care in Austin, Texas.

33. The healthcare providers who treated John Miller maintained his medical records within Epic's EHR platform, MyChart, in individual patient portals associated with each healthcare provider.

34. In 2023, while his disability claim remained pending, John Miller died in a tragic accident.

35. After John Miller's death, Larry Miller continued pursuing the disability claim on his son's behalf.

36. However, because substantial portions of John Miller's medical records were stored within MyChart accounts associated with John Miller's personal login credentials, Larry Miller was unable to electronically retrieve significant portions of his son's medical records, including nearly two years of treatment records.

37. The inability to obtain those records prevented the full development of the evidentiary record necessary to support John Miller's disability claim and his appeal remains ongoing.

---

38. Plaintiff John Hodges is an individual who applied for Social Security disability benefits and was required to obtain medical records from multiple healthcare providers in order to document his disability.

39. Beginning in approximately March 2023, John Hodges attempted to obtain the medical records necessary to support his disability claim.

40. John Hodges received treatment from multiple healthcare providers including Baptist Health.

41. These healthcare providers maintain their electronic medical records within Epic Systems' electronic health record platform, with patient access primarily provided through MyChart patient portals associated with each healthcare system.

42. Because John Hodges received treatment across multiple provider networks, his medical records were fragmented across separate MyChart portals, each requiring separate logins and access procedures.

43. Because the online process was too fragmented and difficult, John Hodges attempted to obtain his medical records through paper authorization forms, direct requests to hospitals, and in-person visits to medical facilities.

44. Despite these efforts, assembling John Hodges's complete medical record proved difficult and time-consuming.

45. These barriers delayed the assembly of John Hodge's medical record and interfered with the development of the evidentiary record necessary to support his disability claim.

**B. Associational Plaintiff**

46. Plaintiff American Association of Disability Justice ("AADJ") is a nonprofit organization dedicated to improving access to disability benefits and medical records for individuals with disabilities.

47. AADJ's members include disability claimants, disability representatives, attorneys, and advocates who assist individuals in obtaining Social Security disability benefits.

48. Access to complete medical records is essential to documenting disability claims, which require longitudinal medical evidence from multiple healthcare providers.

49. Many AADJ members have experienced substantial barriers in obtaining medical records because those records are stored in Epic Systems' electronic health record platform and accessible primarily through fragmented patient portals such as MyChart.

50. Epic's technological barriers to interoperability and record aggregation have directly interfered with AADJ's mission to facilitate efficient access to medical records for disabled individuals.

51. As a result of Epic's conduct, AADJ has been forced to divert significant organizational resources toward overcoming these barriers and assisting its members in obtaining medical records that should be accessible through interoperable electronic systems.

## C. Defendant

52. Defendant Epic is a Wisconsin corporation headquartered in Verona, Wisconsin.

53. Epic develops and sells EHR software used by hospitals, health systems, and healthcare providers throughout the United States.

54. Epic's EHR platform stores and manages the medical records of hundreds of millions of patients nationwide.

55. Epic provides patient access to those records primarily through its MyChart patient portal, which is widely used by healthcare providers that operate Epic systems.

56. Epic's design and implementation of its systems, including its reliance on fragmented patient portals and restrictions on third-party access, have created barriers to retrieving and aggregating medical records across providers.

## II. JURISDICTION AND VENUE

## A. Subject Matter Jurisdiction

57. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the laws of the United States, including the Sherman Act, 15 U.S.C. §§ 1–2, the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., the Rehabilitation Act, 29 U.S.C. § 794, and the interoperability provisions of the 21st Century Cures Act, 42 U.S.C. § 300jj–52.

58. This Court also has jurisdiction pursuant to 15 U.S.C. §§ 4 and 15, which authorize suits for injunctive relief and damages arising from violations of the federal antitrust laws.

59. This Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because:

    a.   the proposed class consists of more than 100 members;

    b.   at least one member of the proposed class is a citizen of a state different from Defendant; and

    c.   the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

60. Plaintiffs seek treble damages under the federal antitrust laws, as well as injunctive relief, attorneys' fees, and costs.

61. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, because those claims arise from the same nucleus of operative facts as Plaintiffs' federal claims.

---

**B. Interstate Commerce Allegations**

62. Epic's conduct substantially affects interstate commerce under (*Gibbons v. Ogden*, 22 U.S. 1).

63. Epic develops, licenses, and maintains electronic health record systems used by hospitals and healthcare providers throughout the United States.

64. Epic's software infrastructure governs storage, access, and exchange of medical records for disabled individuals receiving healthcare services across multiple states.

65. Epic's conduct therefore restrains trade and affects the flow of electronic health information across state lines.

## C. Personal Jurisdiction

66. This Court has personal jurisdiction over Defendant Epic because Epic transacts business throughout the United States, including within the State of Texas and within this District. *See Federal Rule of Civil Procedure 4(k)(1)(A) and 4(k)(2).*

67. Epic licenses and maintains electronic health record systems used by hospitals and healthcare providers located within the Western District of Texas.

68. Epic's software infrastructure governs the storage, access, and exchange of medical records for patients receiving healthcare services within this District.

69. Epic has purposefully directed its business activities toward Texas and this District by providing electronic health record systems to hospitals and healthcare providers located within this District.

70. Plaintiffs' claims arise directly from Epic's conduct affecting the accessibility and exchange of medical records within this District.

## D. Venue

71. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District.

72. Epic's electronic health record systems are used by healthcare providers located within this District, and Epic's conduct affects the accessibility and exchange of medical records for patients receiving healthcare services within this District.

73. Venue is also proper in this District because one or more Plaintiffs reside in this District and suffered injuries within this District as a result of Epic's conduct.

74. Venue is additionally proper pursuant to 15 U.S.C. § 22, which provides that antitrust actions against a corporation may be brought in any district in which the corporation transacts business.

75. Epic transacts business within this District by licensing and maintaining electronic health record systems used by healthcare providers located within this District.

---

## IV. FACTUAL ALLEGATIONS

### A. Epic's Rise to Dominance in the Hospital EHR Market

76. EHR is the backbone of the U.S. Healthcare system. Hospitals and medical providers alike rely upon patient data to accurately diagnose and treat their patients. Patients (and their parents and caregivers) rely upon their medical information to access necessary public benefits (including Social Security Disability Benefits) and to obtain necessary medical care and treatment.

77. Epic is the largest EHR vendor in the United States. Epic owns over 40% of the market share and houses over 325 million patient records, including tens of million of Texans' medical records. Altogether these records account for 90% of all United States citizens.

78. Epic is a multi-billion-dollar technology company that understands the value of patient data. Epic has developed and sells database software that allows hospitals and healthcare providers to organize and store EHR while treating patients.

79. Epic's approach began with its success in the hospital EHR market. The company focused on large hospital systems and offered a fully integrated platform that combined clinical records, scheduling, billing, revenue cycle management, laboratory systems, and patient communications within a single database architecture. Hospitals often adopted Epic because it promised a unified system rather than the fragmented set of software tools that many health systems had previously relied upon. Although implementation costs could reach hundreds of millions of dollars, large hospitals frequently chose Epic because it was perceived as the most comprehensive and lowest-risk enterprise EHR platform.

80. Once a hospital adopted Epic internally, the system became deeply embedded in nearly every operational workflow. Once a hospital network converted to Epic, switching to a new EHR vendor became cost-prohibitive essentially locking in customers into perpetuity. This is the starting point for Epic's multi-pronged anti-competitive strategy that established it as the monopolistic gatekeeper of EHR.

81. Prior to the widespread adoption of Epic and MyChart, hospitals frequently operated their own patient portals or used portals from other vendors. Epic positioned MyChart, its patient portal, as a standardized alternative that could unify the patient experience across departments and services. When hospitals migrated to Epic's EHR platform, they commonly retired their legacy portals and replaced them with MyChart in order to simplify their technology stack and provide a single login and communication channel for patients.

82. Since Epic controlled the data structure, MyChart could immediately display lab results, appointment information, medication lists, and visit summaries without additional development work. By contrast, third-party portals often required complex integrations, additional security reviews, and ongoing maintenance to pull data from the Epic system. As a

result, many hospitals found it easier to adopt MyChart rather than maintain their own portal or integrate a competing product.

83. As a result, millions of patients interact with their health information primarily through MyChart rather than through independent or third-party health applications.

84. This structure further strengthened Epic's role as the central platform through which patient health data flows. The more patients who create MyChart accounts and use the portal to access records, the more entrenched Epic becomes as the intermediary between patients and healthcare providers. This dynamic reinforced Epic's broader EHR dominance.

85. Epic's dominant control of patient data has created a kind of data gravity where other EHR software must connect to Epic's platform in order to function within the EHR space. Because Epic controls the interfaces through which these integrations occur, Epic effectively determines how and under what conditions third-party applications can access patient data.

**B. Epic's Network Effects and Hospital Lock-In Entrench Its Monopoly**

86. Epic's dominance in the enterprise hospital electronic health record market is reinforced by powerful network effects and substantial switching costs.

87. Hospitals rely on electronic health record systems to manage nearly every aspect of clinical operations, including patient records, physician documentation, laboratory systems, imaging systems, billing systems, scheduling systems, and regulatory reporting.

88. Implementing a hospital-wide electronic health record system requires extensive technical integration across numerous clinical and administrative systems.

89. Hospitals typically invest hundreds of millions of dollars and several years of implementation work when deploying an enterprise EHR system.

90. Once implemented, replacing an EHR system requires a hospital to:

    a. migrate large volumes of patient data;

    b. retrain physicians, nurses, and administrative staff;

    c. rebuild clinical workflows;

    d. replace integrated billing and scheduling systems; and

    e. reconfigure connections with laboratories, imaging systems, and outside providers.

91. These costs create substantial barriers to switching from one EHR system to another.

92. Hospitals therefore rarely replace an existing EHR system once it has been implemented.

93. These network effects and switching costs reinforce Epic's monopoly power in the enterprise hospital EHR market and make it difficult for competitors to challenge Epic's dominance.

---

**C. Epic's Control Over Interoperability Infrastructure**

94. Epic's dominance is further reinforced by network effects arising from Epic-to-Epic interoperability.

95. Hospitals using Epic systems can exchange medical records with other Epic hospitals more easily than with hospitals using competing electronic health record systems.

96. These interoperability advantages encourage hospitals to adopt Epic systems in order to join the network of other Epic healthcare providers.

97. As more hospitals adopt Epic systems, the value of the Epic network increases, further reinforcing Epic's dominance.

98. These network effects make it increasingly difficult for competing EHR vendors to attract hospital customers.

99. Epic's installed base of hospital systems therefore acts as a barrier to entry that protects Epic's market power.

100. Because Epic's systems store medical records for a substantial portion of patients receiving care in the United States, competitors seeking to provide interoperability or record-aggregation services must interact with Epic's infrastructure.

101. Epic's control over these systems allows Epic to influence how medical records are accessed, exchanged, and aggregated across healthcare providers as a whole.

102. Epic has used this position to design interoperability architecture that favors Epic systems while limiting the ability of competing platforms to retrieve and aggregate medical records.

---

**D. Epic's Opposition to Interoperability**

103. In 2009, the Hitech Act created the Medicare and Medicaid Electronic Health Record Incentive Programs, commonly known as the "Meaningful Use" program, to accelerate nationwide adoption of interoperable electronic health records.

104. Through the Meaningful Use program, Congress provided over $35 billion to hospitals and healthcare providers that adopted and meaningfully used certified EHR technology. Providers were eligible for substantial Medicare and Medicaid incentive payments if they implemented systems capable of electronic recordkeeping, quality reporting, data exchange, and patient access to medical information.

105. A central purpose of the program was to promote interoperability and the secure electronic exchange of health information, ensuring that patients and authorized third parties could obtain medical records electronically across providers without technological or proprietary barriers.

106. Although the incentive payments were made to hospitals and providers rather than directly to software vendors, EHR vendors, including Epic, benefited substantially from these federal subsidies because providers used incentive funds to purchase and implement certified EHR systems.

107. During the Meaningful Use period, hospitals and healthcare systems across the United States rapidly adopted Epic's EHR platform in order to qualify for federal incentive payments. As a result, federally funded EHR adoption significantly accelerated Epic's growth and market penetration in the hospital EHR market.

108. Much of the data stored in Epic was generated and digitized through technology deployments financed in part by federal Meaningful Use incentives, meaning that medical records created through federally subsidized health IT infrastructure are now frequently controlled through Epic's proprietary ecosystem, including the MyChart patient portal and Epic's interoperability networks.

109. The federal government funded EHR adoption with the expectation that these systems would facilitate interoperability, improve data exchange, and expand patient access to medical records. Epic's practices, described below, instead restrict and fragment access to those records through proprietary technical barriers that impede interoperability and patient-authorized access.

110. In effect, federal subsidies helped finance the nationwide digitization of medical records that are now maintained within Epic-controlled systems. While Congress intended that these records be easily accessible and exchangeable across the healthcare system, Epic's architecture and policies allow it to function as a gatekeeper over access to a vast portion of the country's electronic health information.

111. Epic was well aware of the federal government's interoperability goals. The Meaningful Use program and subsequent federal health IT regulations repeatedly emphasized electronic data exchange, patient access to records, and the elimination of technological barriers to interoperability. Despite this regulatory framework and despite benefitting from the widespread adoption of its systems during the federally funded EHR expansion, Epic has implemented technical and contractual practices that undermine the interoperability objectives that the HITECH Act and subsequent federal regulations were designed to achieve.

112. In 2020, HHS was working to enact a final rule, drafted by ONC, that required EHRs to operate seamlessly with third-party apps, and prevents EHR vendors and health care systems from blocking or inhibiting the flow of information between health information technology systems or to patients.

113. Epic's CEO, Judith Faulkner encouraged Epic's customers (major hospital systems) to oppose the proposed HHS rule. Epic further planned to sue HHS to prevent implementation[1]. Epic essentially doubled down on blocking vital improvements to interoperability, a federally funding project that essentially funded and created Epic's success in the EHR space, all so Epic could maintain its monopoly on storing EHR.

114. By 2023, Epic appeared to have flip-flopped its position when it became one of the first QHINs within the TEFCA framework.

115. Epic's designation as QHIN allowed Epic to present itself as a supporter of nationwide health data exchange, a participant in federal interoperability frameworks, and a protector of patient privacy and security. However, Epic's conduct demonstrates that its involvement in

---

[1] *See https://www.statnews.com/2020/01/27/epic-block-proposed-data-rule/ .*

TEFCA also provides it with a mechanism to shape and restrict the very interoperability of EHR that TEFCA was designed to promote.

116. Despite TEFCA's extensive privacy safeguards designed specifically to allow secure data exchange, Epic repeatedly invokes privacy concerns as justification for restricting independent data access and interoperability. In practice, Epic's privacy arguments operate as a gatekeeping mechanism that allows Epic to challenge competing interoperability platforms, restrict third-party data access, maintain control over how patient records are exchanged.

## E. Epic Creates Technological Barriers to Interoperability

117. Epic has constructed and maintained a technological ecosystem that fragments patient health data and restricts third-party access, despite federal policies designed to enable seamless interoperability across EHR systems.

118. Epic's architecture is deployed separately at each hospital or health system that licenses the software. While those installations may use the same software vendor, each deployment typically maintains its own database environment, configuration settings, and access controls.

119. As a result, a patient who receives care at multiple Epic hospitals does not have a unified health record within Epic's infrastructure. Instead, their medical information is fragmented across multiple institutional silos controlled by separate Epic installations.

120. Even when Epic systems exchange data through Epic's proprietary Care Everywhere network, the exchange is limited and dependent on the receiving institution's configuration and consent settings. This fragmentation forces patients, caregivers, and authorized third-party applications to retrieve records separately from each provider organization.

121. For disabled individuals seeking disability benefits this fragmentation creates substantial barriers to assembling the longitudinal medical records necessary to document disability.

122. Rather than facilitating direct access through standardized national exchange networks, Epic frequently routes patient access through its proprietary patient portal, MyChart, which functions as a series of individual accounts maintained by each provider organization.

123. This approach requires patients to maintain and manage multiple separate MyChart accounts for each hospital or clinic using Epic software.

124. For patients receiving care from multiple providers, accessing their full medical history often requires logging into numerous portals and manually downloading records. The result is a fragmented and incomplete view of a patient's medical history.

125. Under TEFCA and related interoperability standards, a third-party application that has completed appropriate certification and identity verification processes can request patient data through standardized application programming interfaces ("APIs") and exchange networks without requiring additional proprietary login credentials for each provider portal.

126. Epic nevertheless requires that third-party applications direct users to authenticate through individual MyChart portal credentials associated with each provider organization before data can be retrieved.

127. This requirement creates unnecessary friction in the data-exchange process and forces third-party applications to rely on Epic's proprietary authentication infrastructure rather than the TEFCA framework established solely for interoperable exchange.

128. As a result, even when an application has completed nationally recognized certification processes designed to establish trust and security, Epic's systems still impose additional barriers that prevent efficient access to patient records.

129. Epic also restricts interoperability through the design and governance of its APIs. Third-party developers seeking to build applications capable of retrieving patient records must

integrate through Epic-controlled APIs and developer programs. These programs impose technical and contractual requirements that can limit how applications retrieve or use patient data.

130. Epic's policies and infrastructure therefore function as a gatekeeping mechanism for EHR access. By controlling the APIs through which external applications must operate, Epic maintains the ability to determine which applications can access its ecosystem and under what conditions.

131. This gatekeeping power enables Epic to favor its own ecosystem, including MyChart and Epic-affiliated tools, while restricting or complicating the ability of independent applications to assemble complete patient records across providers.

132. Epic publicly admits that it does not own the EHR and that data is owned by the patient and medical providers who treat or provide care to the patient. Despite this admission, Epic consistently holds patient data hostage and inserts itself as a gatekeeper to prevent access to patient records.

133. Because Epic has monetized MyChart account access, it has intentionally created system architecture that fragments medical records across provider portals, prevents unified access to complete medical histories, and requires duplicative EHR retrieval efforts.

134. Epic's monopolistic tactics positioned it as the gatekeeper to patient EHR and Epic abuses that power to delay, restrict, or completely prevent access to that EHR by companies that compete or could potentially compete with Epic. Epic's anticompetitive conduct has restricted trade, stifled innovation, and single-handedly thwarted interoperability.

---

**F. The Social Security Disability Determination Process Relies on Complete Medical Records**

135. The Social Security Administration ("SSA") administers federal disability benefit programs, including Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI").

136. To obtain disability benefits, an applicant must demonstrate that he or she has a medically determinable impairment that prevents the individual from engaging in substantial gainful employment.

137. SSA evaluates disability claims using a five-step sequential evaluation process, which determines whether a claimant is disabled within the meaning of the Social Security Act.

138. Under this process, SSA evaluates:

  a. whether the claimant is engaged in substantial gainful activity;

  b. whether the claimant has a severe medically determinable impairment;

  c. whether the impairment meets or equals a listed impairment;

  d. the claimant's residual functional capacity and ability to perform past work; and

  e. whether the claimant can perform other work in the national economy.

139. Medical evidence is the cornerstone of the disability determination process.

140. SSA regulations require objective medical evidence from acceptable medical sources to establish the existence and severity of a claimant's impairment.

141. Medical reports submitted to SSA typically include medical histories, clinical findings, diagnostic testing, laboratory results, treatment histories, and medical opinions regarding the claimant's functional limitations.

142. Longitudinal medical evidence is particularly important because many disabling conditions develop or worsen over time and cannot be accurately assessed through a single medical visit.

143. SSA's internal guidance recognizes that disability determinations require medical evidence covering a significant period documenting the claimant's medical history and response to treatment.

144. In addition, SSA requires medical records demonstrating that a claimant's impairment has lasted or is expected to last for at least twelve months.

145. Because of these requirements, disabled individuals must often obtain medical records from numerous healthcare providers to demonstrate the severity and duration of their impairments.

146. After a disabled individual files an application for disability benefits, the claim is transferred to a state Disability Determination Services ("DDS") agency for medical evaluation.

147. SSA and the disabled individual applying for benefits have a co-duty to develop the medical record for the non-adversarial factfinding process. Because of this duty, DDS examiners are responsible for gathering and reviewing medical evidence from the claimant's treating providers before making an initial disability determination.

148. DDS attempts to obtain medical records directly from the disabled individual's healthcare providers and medical sources.

149. SSA uses these records to determine whether a claimant's impairments meet or equal the medical criteria described in SSA's Listings of Impairments.

150. Medical evidence is also used to determine a claimant's residual functional capacity, which measures the claimant's ability to perform work-related activities.

151. Obtaining medical records from healthcare providers is frequently the most time-consuming part of the disability determination process. The time required to obtain medical records often determines how long a disability claim remains pending.

152. When medical records cannot be obtained in a timely manner, disabled individuals may be required to attend consultative examinations or experience significant delays in the evaluation of their claims.

153. DDS examiners cannot make a determination until sufficient medical evidence has been collected to evaluate the claimant's impairments. Delays in obtaining medical records can therefore determine whether claimants are able to timely demonstrate the severity and duration of their impairments.

154. At the initial determination stage, disability claims commonly take six to eight months, and the timeline largely depends on how quickly DDS can obtain medical evidence from treating providers.

## G. Epic Knew That Access to Medical Records Is Critical to Disability Determinations

155. Epic has long been aware that access to medical records is essential for disabled individuals seeking disability benefits and for government agencies responsible for adjudicating disability claims.

156. Epic has publicly acknowledged that improving electronic access to medical records can streamline the processing of disability claims by the Social Security Administration.

157. Epic has participated in initiatives and discussions concerning the electronic exchange of medical records for government disability programs.

158. One such initiative is the Health Information Technology Medical Evidence Request ("HITMER") system, which allows the Social Security Administration to request medical records directly from healthcare providers through electronic health record systems.

159. Through HITMER and related electronic medical evidence programs, SSA seeks to obtain medical records from healthcare providers electronically rather than through traditional paper-based requests.

160. These programs were created to reduce delays in disability adjudications caused by the time required to obtain medical records from hospitals and healthcare providers.

161. SSA has explained that obtaining medical records from healthcare providers is often the most time-consuming part of the disability determination process.

162. Electronic health record systems play a critical role in these initiatives because they store the medical records that SSA must review in order to evaluate disability claims.

163. Electronic health record vendors, healthcare providers, and health information technology developers are therefore aware that their systems affect the ability of SSA to obtain medical evidence needed for disability determinations.

164. The success of SSA's electronic medical evidence initiatives depends on the ability of electronic health record systems to transmit medical records efficiently and interoperably.

165. Through these initiatives, Epic has demonstrated knowledge that disability determinations depend on the ability of claimants and government agencies to obtain comprehensive medical records from multiple healthcare providers.

166. Epic therefore knew that barriers to accessing and aggregating medical records would directly affect individuals seeking disability benefits. Epic also knew that barriers to interoperability and medical record aggregation could delay or prevent disability claimants

from assembling the medical evidence required to demonstrate their eligibility for benefits.

---

**H. Epic's MyChart Architecture Foreseeably Harms Disabled Individuals**

167. Despite this knowledge, Epic designed and maintained an electronic health record architecture that fragments patient medical records across provider-specific portals and limits the ability of patients and third-party platforms to aggregate those records.

168. Epic knew that its architectural decisions would make it significantly more difficult for disabled individuals to obtain the comprehensive medical documentation required by federal disability programs.

169. Epic hospitals typically provide patient access to medical records through Epic's proprietary patient portal platform, MyChart.

170. MyChart is not a single national portal. Instead, each healthcare provider operating Epic maintains its own separate MyChart instance.

171. Each of these accounts requires separate registration, authentication, and login credentials. As a result, patients cannot obtain a unified set of medical records through a single Epic portal. Instead, patients must access each provider's portal separately and retrieve records individually.

172. This fragmented system prevents patients and third-party platforms from efficiently aggregating a complete medical history across multiple healthcare providers.

173. Patients cannot automatically access MyChart records. Access to each MyChart portal is established through an account activation process controlled by the healthcare provider.

174. In many cases, patients receive an activation code during a medical visit or through a mailed letter.

175. Patients must then create a MyChart account using that activation code and personal identifying information. If the activation code expires or is lost, patients must request a new code from the provider.

176. Patients who receive care from multiple Epic hospitals must repeat this process separately for each provider.

177. Many patients are unaware that separate MyChart accounts exist for each healthcare system, which can prevent them from accessing records stored at different providers.

178. Once a MyChart account is created, patients must authenticate their identity through login credentials and security verification procedures.

179. Many Epic MyChart portals require two-factor authentication ("2FA") in order to access medical records. These authentication systems frequently require patients to receive verification codes through text messages, email, or authentication applications.

180. Patients who do not maintain stable phone service, email access, or smartphone devices may be unable to complete these authentication steps.

181. Patients who fail authentication attempts may be locked out of their accounts and required to repeat the verification process.

182. These authentication barriers significantly increase the difficulty of retrieving medical records, particularly for vulnerable populations, specifically for disabled individuals.

183. Many patients rely on family members, caregivers, or legal representatives to help manage their healthcare and obtain medical records.

184. Epic's MyChart system includes a "proxy access" feature that allows another individual to access a patient's account. However, proxy access requires creation of the individual

account by the disabled individual and then they would be responsible for logging in and authorizing and sharing proxy access.

185. Proxy access may also be limited depending on the patient's age, status, or provider policies.

186. As a result, family members and caregivers assisting disabled individuals frequently cannot access medical records through MyChart even when those records are necessary for medical or legal purposes.

187. The absence of reliable proxy access significantly complicates the ability of disabled individuals to retrieve medical records needed for disability claims.

188. Many disabled individuals face additional barriers when attempting to access MyChart portals. Patients with visual impairments, cognitive limitations, or other disabilities may have difficulty navigating complex web-based portals.

189, MyChart portals vary across providers and frequently present different layouts, navigation systems, and authentication procedures.

190. Disabled individuals who must access records from multiple providers must learn and navigate multiple portal interfaces. These differences increase the difficulty of locating and retrieving medical records.

191. Disabled individual often experience disproportionately limited digital literacy or limited access to computers or smartphones face additional obstacles when attempting to retrieve records through online portals.

192. Because Epic fragments patient records across multiple portals, disabled individuals must manually locate and retrieve records from each provider individually. These barriers significantly increase the cost and difficulty of assembling complete medical record sets. As

a result, many patients and organizations are unable to obtain comprehensive medical records across all treating providers.

193. Epic's conduct created foreseeable barriers to disability individuals seeking to access their EHR for disability claims, other governmental benefits, or necessary treatment.

**I. Plaintiff Experiences Demonstrate the Real-World Consequences of Epic's Conduct**

**Impact on John and Larry Miller**

194. The real-world consequences of Epic's interoperability barriers are illustrated by the experiences of disabled individuals whose ability to obtain benefits depended on assembling medical records from multiple healthcare providers.

195. Larry Miller knows how fragmented medical records can make the disability process nearly impossible. His son, John Miller lived and worked in the Austin, Texas area for many years as a car salesman until severe complications from diabetes mellitus forced him to stop working. As his condition progressed, John began experiencing episodes of dizziness and fainting and ultimately fainted at work, ending his employment.

196. During this time, John experienced periods of homelessness and primarily received medical treatment at emergency departments in the Austin area and a low-income clinic, Sandra Joy Anderson Community Care in Austin, Texas.

197. Sandra Joy Anderson Community Care maintained their records within Epic's electronic health record system and made patient access available primarily through MyChart.

198. On May 10, 2021, John applied for Social Security disability benefits. Despite receiving treatment for severe diabetic complications, including amputations and visual

impairments, John Miller's disability claim was denied twice due to "insufficient medical evidence".

199. Even though the records from Sandra Joy Anderson Community Care were maintained in MyChart, neither John Miller nor SSA could access them.

200. On February 5, 2023, while his disability claim remained pending, John Miller died in a tragic accident.

201. After his death, his father, Larry Miller attempted to obtain and update the medical evidence necessary to support the claim. At that point, however, Larry Miller encountered a critical barrier: much of John Miller's medical record was maintained in Epic's system and accessible only through the MyChart patient portal associated with John's personal login credentials.

202. However, because significant portions of John Miller's records were maintained within MyChart accounts associated with John Miller's personal credentials, those records could not be accessed after his death.

203. As a result, nearly two years of medical records remained unavailable, including records documenting the progression of John Miller's diabetes and resulting complications.

204. The inability to retrieve those records prevented the full development of the evidentiary record in John Miller's disability case and his appeal is still pending today.

205. Because of his inability to access his medical records, John Miller died without ever receiving the benefits he desperately needed.

206. The barriers encountered by the Miller family are representative of the experiences of many disabled individuals and families who cannot access complete medical records

maintained within Epic's MyChart-based ecosystem, particularly when the patient is incapacitated, homeless, or deceased.

---

**Impact on John Hodge**

207. John Hodges's experience illustrates a second common barrier created by Epic's system design: fragmentation of records across multiple MyChart portals.

208. As stated above, John Hodges was a successful small business owner until a series of heart attacks left him unable to work.

209. John Hodges worked for many years in this physically demanding occupation, frequently traveling to events and working long hours.

210. In 2017, John Hodges suffered a series of serious cardiac events, including multiple heart attacks. Following these cardiac events, John Hodges underwent triple-bypass heart surgery.

211. Despite these severe health issues, John Hodges continued attempting to work for several years in order to support himself and his family.

212. Over time, however, the cumulative effects of his cardiac disease made it increasingly difficult for him to continue working.

213. John Hodges experienced repeated hospitalizations and ongoing medical complications related to his heart condition.

214. As his health deteriorated, John Hodges eventually became unable to maintain consistent employment and ultimately lost his company.

215. In March 2023**,** John Hodges applied for Social Security disability benefits. In order to support his disability claim, John Hodges needed to obtain medical records documenting his treatment from multiple hospitals and healthcare providers.

216 John Hodges received treatment at several healthcare systems including Integris Health**.** Each of these healthcare systems maintained separate electronic health record systems and patient portals. Many of John Hodges's records were stored in Epic's MyChart portals.

217. John Hodges's records were stored in fragmented electronic health record systems controlled by Epic. The intentionally complicated medical records retrieval process meant that John Hodges was unable to access a complete set of his medical records through available systems. Instead of seamless electronic access, John was forced to submit repeated manual requests and wait for responses from individual providers.

218. Even with legal assistance, retrieving records from multiple healthcare systems required contacting each provider individually and navigating separate authorization and record-release procedures.

219. These delays significantly slowed the development of John Hodge's disability claim. John Hodges ultimately waited more than two years for his disability claim to be fully resolved.

220. After years of delays and medical hardship, John Hodges was finally awarded disability benefits in September 2025, but John Hodges never got back everything he lost during the process.

221. Unfortunately, during the period between his initial application and his eventual approval, John Hodges experienced severe financial hardship causing him to become homeless. Due to his homeless, John Hodges lost custody of his daughter.

222. John's experience is not unique. Across the United States, millions of disabled individuals depend on timely access to their medical records in order to obtain medical care, coordinate treatment among providers, apply for disability benefits, and make critical health decisions.

223. The harm experienced by the individual Plaintiffs and other members of the Class were a direct and foreseeable consequence of Epic's design and control of medical record access systems.

**J. AADJ Developed an Interoperable Portal to Improve Medical Record Access**

224. AADJ is a nonprofit organization dedicated to improving access to justice for individuals with disabilities.

225. A central component of AADJ's mission is improving the ability of disabled individuals to obtain medical records necessary to pursue disability benefits and coordinate medical care.

226. Individuals with disabilities frequently require medical records from multiple healthcare providers in order to demonstrate eligibility for disability benefits or obtain appropriate medical treatment. Because these records are often stored across multiple hospitals and healthcare systems, disabled individuals frequently face significant barriers when attempting to assemble complete medical histories.

227. To address this problem, AADJ sought to develop a technological solution that would allow individuals to retrieve and aggregate medical records across healthcare providers through a single interoperable interface.

228. AADJ worked with multiple technology companies to develop and implement Individual Access Services ("IAS") portal designed to retrieve EHR across healthcare providers through modern interoperability frameworks.

229. The portal was designed to comply with federal interoperability standards established under TEFCA, which was created to enable secure nationwide exchange of electronic health information.

230. AADJ designed its IAS portal to meet the technical and policy requirements established under the TEFCA framework for retrieving electronic health information.

231. The purpose of the IAS portal was to allow individuals, particularly disabled individuals, to retrieve medical records from multiple healthcare providers through a single secure interface.

232. Such a system would allow disability claimants to assemble the comprehensive medical records required to support disability claims without navigating multiple patient portals across different healthcare systems or remembering every medical provider they've seen for treatment.

233. For approximately six months, AADJ ran tests with two different technology companies using Clear for identity verification. Yet, despite completing the necessary verification, records from Epic would not come through.

234. AADJ compared the records retrieved from IAS to those received by providers and noticed that the records were largely incomplete.

235. As AADJ's technology team worked to resolve these issues, it became apparent that Epic was requiring a secondary privacy verification involving logging into each individual MyChart portal.

236. AADJ sought to build IAS technology because remembering multiple providers and logins was a significant barrier to retrieving medical records.

237. After all the work to build a true IAS on-ramp, AADJ was shocked to find that Epic was intentionally blocking accessibility and fragmenting medical records.

## K. Epic's Architecture Prevents Independent Interoperability Portals

238. Despite participating as a QHIN within TEFCA, Epic's architecture prevents independent interoperability portals from efficiently retrieving medical records stored within Epic systems.

239. Unlike other participants in TEFCA, Epic requires patients to authenticate access to medical records through provider-specific patient portals such as MyChart.

240. As a result, electronic systems seeking to retrieve medical records for individual access cannot simply aggregate records through a unified interoperability interface.

241. Instead, Epic's architecture requires patients, namely disabled individuals, to log into each provider's individual portal in order to access records.

242. These portal-based authentication requirements prevent independent interoperability portals from retrieving records across multiple Epic healthcare providers through a single interface.

243. Because Epic's systems store medical records for a substantial portion of healthcare providers, these restrictions significantly limit the ability of interoperability platforms to aggregate patient records across providers.

244. Epic's architectural decisions therefore undermine the ability of independent IAS portals to function as intended under the TEFCA framework.

245. By requiring provider-specific portal authentication rather than interoperable data exchange, Epic preserves its control over the pathways through which patient medical records are accessed.

246. These restrictions prevent organizations such as AADJ from developing interoperable systems capable of retrieving medical records for individuals with disabilities who must assemble records across multiple healthcare providers.

247. As a result, Epic's architecture prevents the development of tools that would allow disabled individuals to efficiently retrieve medical records needed for disability claims.

248. Epic's monopolistic control over electronic health record infrastructure allows Epic to dictate the technological pathways through which patient medical records are accessed and exchanged.

249. Epic's architectural restrictions therefore foreclose the development of independent record-aggregation platforms and has prevented organizations such as AADJ from deploying interoperability tools designed to improve medical record access for individuals with disabilities.

250. Epic's conduct therefore harms competition in interoperability markets, organizations working to improve access to medical records for disabled individuals, and disabled individuals themselves.

## L. Relevant Market

**Relevant Product Market**

251. The relevant product markets in this case are: the market for enterprise EHR systems used by hospitals and large health systems in the United States; and the market for

interoperable access to electronic health records and medical record aggregation services that allow patients to retrieve medical records across multiple healthcare providers.

252. Epic's customers include many of the largest hospital systems in the country, and Epic EHR software is estimated to be used by a majority of U.S. hospitals and a substantial percentage of U.S. physicians. Epic's market position has been repeatedly characterized by regulators, courts, and industry analysts as dominant within the hospital EHR sector.

253. Enterprise hospital EHR systems are complex software platforms used by hospitals and large health systems to store, manage, and exchange patient medical records and clinical data.

254. These systems serve as the core infrastructure through which hospitals manage clinical documentation, patient records, laboratory systems, imaging systems, medication management, billing, and regulatory reporting.

255. Enterprise EHR systems differ fundamentally from smaller clinical software products used by individual physician practices or specialty clinics.

256. Hospitals and large health systems require EHR systems capable of supporting:

   a. inpatient and outpatient clinical workflows;

   b. integrated clinical documentation;

   c. laboratory and imaging systems;

   d. medication management;

   e. billing and administrative operations; and

   f. large-scale electronic storage and exchange of patient medical records.

257. Because of these requirements, enterprise hospital EHR systems are not reasonably interchangeable with smaller clinical software systems or standalone digital health applications.

258. Hospitals undertake extensive procurement processes when selecting enterprise EHR systems, often lasting several years and involving significant financial investment.

259. Once implemented, EHR systems become deeply integrated into hospital infrastructure and clinical workflows.

260. As a result, hospitals face extraordinarily high switching costs if they attempt to replace an existing enterprise EHR system.

261. These switching costs include:

      a. migration of large volumes of patient data;

      b. retraining of physicians, nurses, and administrative staff;

      c. rebuilding clinical workflows;

      d. reconfiguring connections with laboratories and imaging systems; and

      e. replacing integrated billing and administrative software.

262. Because of these costs, hospitals rarely replace their enterprise EHR systems once installed.

263. The second relevant market, the market for interoperable medical record access and aggregation, consists of platforms and services that allow patients and authorized entities to retrieve electronic health records from multiple healthcare providers.

264. Epic's electronic health record system is the largest EHR platform in the United States and contains records for over 250 million patients. Public reporting indicates Epic systems account for approximately 75–78% of hospital patient records in the United States.

265. Epic's MyChart is one of the most widely deployed patient portals in the United States and is frequently the exclusive means by which patients of Epic-affiliated hospitals may access their electronic medical records. Epic further provides ancillary services including third-party application integration through its "Epic App Orchard" program.

266. Such platforms are used by patients, healthcare providers, researchers, and organizations assisting individuals in obtaining medical records.

267. Effective competition in this market depends on the ability of platforms to retrieve medical records from electronic health record systems used by hospitals and healthcare providers.

268. Without access to records stored within hospital EHR systems, interoperability platforms cannot provide meaningful aggregation of patient medical records.

269. Epic's dominance in hospital electronic health record systems means that a substantial share of medical records needed for healthcare coordination, insurance claims, and disability determinations are stored within Epic systems.

270. Because Epic systems store medical records for such a large portion of patients receiving care in the United States, interoperability platforms seeking to retrieve medical records across healthcare providers must interact with Epic infrastructure.

271. Epic's control over access to 250 million Americans' records gives Epic significant influence over the ability of patients and third-party platforms to retrieve and aggregate medical records across healthcare systems.

**Relevant Geographic Market**

272. The relevant geographic markets for both enterprise hospital EHR systems and interoperable medical record aggregation services are the United States of America.

273. Hospitals across the United States procure enterprise EHR systems from national vendors.

274. Electronic health record vendors compete on a nationwide basis for hospital contracts.

275. Similarly, interoperability platforms and electronic medical record aggregation services operate across state lines and retrieve records from healthcare providers located throughout the United States.

276. Epic develops and licenses its electronic health record systems to hospitals and healthcare providers across the United States, including hospitals located within this District.

277. Epic's conduct therefore affects interstate commerce and competition across national markets.

## N. Anti-Competitive Conduct

278. Epic possesses a dominant share of the enterprise hospital EHR market in the United States.

279. Epic exploited hospitals' dependence on its software to create a two-prong financial strategy. First, Epic coerced hospital systems to not use overlapping or alternative EHR products by imposing exorbitant fees and penalties. This financial structure encouraged hospitals to direct patients toward MyChart as the primary method to view lab results, schedule appointments, communicate with providers, obtain visit summaries, or download medical records. Once hospitals became dependent on MyChart, Epic then charged hospitals per MyChart account created.

280. Epic has maintained and entrenched its monopoly power through a pattern of exclusionary and anticompetitive conduct designed to restrict interoperability and prevent competing platforms from accessing medical records stored within Epic systems.

281. Epic's conduct includes restricting interoperability pathways, raising rivals' costs, controlling patient access to medical records through Epic-controlled portals, and leveraging its EHR dominance to foreclose competition in adjacent health technology markets.

282. As described in the factual allegations above, Epic designs its systems so that data exchange occurs most efficiently between Epic systems while creating barriers to interoperability with competing platforms.

283. Epic's interoperability architecture favors Epic-to-Epic communication and limits the ability of independent health technology platforms to retrieve and aggregate medical records stored within Epic systems.

284. Epic's control over the technological infrastructure governing medical record exchange allows Epic to dictate how patient records are accessed, shared, and aggregated across healthcare providers.

285. Epic has used this control to maintain its monopoly power and prevent the emergence of competing interoperability platforms.

286. Epic has maintained and entrenched its monopoly power through a pattern of exclusionary and anticompetitive conduct designed to restrict interoperability and prevent competing platforms from accessing medical records stored within Epic systems.

287. These technological restrictions reduce the ability of competing interoperability platforms to provide services that depend on efficient access to patient medical records.

288. By limiting interoperability with competing platforms while facilitating data exchange within the Epic ecosystem, Epic reinforces network effects that strengthen its monopoly position.

289. As described above, Epic imposes technical and architectural limitations on the ways in which third-party platforms can retrieve medical records stored within Epic systems.

290. These limitations require competing platforms to expend substantial resources developing workarounds or pursuing manual record retrieval processes.

291. By increasing the technical and operational burdens faced by competitors seeking to access Epic-controlled data, Epic raises rivals' costs and discourages the development of competing interoperability services.

292. Epic also maintains its monopoly power by controlling the primary pathway through which patients access medical records stored within Epic systems.

293. As described above, hospitals using Epic typically provide patient access to medical records through Epic's MyChart portal infrastructure.

294. Epic's MyChart architecture intentionally fragments patient records across provider-specific portals and requires patients to maintain separate accounts for different healthcare providers.

295. This fragmentation prevents patients and third-party platforms from easily obtaining complete longitudinal medical records across multiple providers.

296. By requiring patients to access records through fragmented portals rather than interoperable record aggregation systems, Epic preserves its control over how patient records are accessed and exchanged.

297. Epic has also leveraged its monopoly in enterprise hospital EHR systems to foreclose competition in adjacent markets for health data access, patient portals, and interoperability services.

298. Hospitals adopting Epic systems rely on Epic-controlled infrastructure to manage patient portals and medical record exchange.

299. As a result, competitors seeking to provide independent patient record access platforms or interoperability services must obtain access to medical records stored within Epic systems.

300. Epic's technological restrictions on interoperability prevent these competitors from effectively competing with Epic-controlled platforms.

301. Epic's conduct therefore extends its dominance beyond the EHR market into related markets for patient record access and health data interoperability.

302. The enterprise hospital EHR market is characterized by substantial barriers to entry.

303. These barriers include:

    a. the enormous cost and complexity of developing enterprise EHR systems capable of serving large hospital systems;

    b. the extensive regulatory requirements governing electronic health records;

    c. the need to integrate with thousands of clinical and administrative systems;

    d. the high switching costs faced by hospitals once an EHR system is installed; and

    e. network effects that favor dominant providers with large installed hospital bases.

304. These barriers make entry by new competitors extremely difficult.

305. Even well-funded technology companies face significant obstacles in developing enterprise EHR systems capable of competing with Epic's installed hospital network.

306. Epic possesses monopoly power in the relevant market.

307. Epic has the power to control the technological conditions under which medical records are accessed, exchanged, and shared.

308. Epic can impose technological restrictions on interoperability and patient record access without losing significant hospital customers.

309. Epic's market dominance therefore allows Epic to maintain exclusionary technological policies that restrict interoperability and disadvantage competing health technology platforms.

310. Epic's monopoly power enables it to control the flow of medical information across a substantial portion of the United States healthcare system.

311. Epic has used this monopoly power to impose technological and contractual restrictions that limit competition in markets for medical record access, interoperability services, and digital health applications.

## O. Anti-Trust Injury

312. Epic's conduct harms competition in markets for electronic health record interoperability, medical record access, and health data exchange services.

313. Effective competition in these markets depends on the ability of patients, healthcare providers, and IAS platforms to obtain and aggregate medical records across healthcare systems.

314. Epic's architectural restrictions prevent independent platforms from efficiently accessing and aggregating medical records stored within Epic systems.

315. These restrictions raise the cost of developing competing interoperability services and discourage the entry of new competitors.

316. Epic's conduct harms consumers by making it more difficult for patients to obtain complete medical records from multiple healthcare providers.

317. Patients frequently require access to medical records in order to coordinate care, obtain second medical opinions, pursue insurance claims, or apply for government benefits.

318. When patients cannot efficiently obtain records across healthcare providers, they face delays in medical treatment, administrative processes, and benefit determinations.

319. Epic's conduct therefore reduces the availability of interoperable services that would allow patients to access and manage their EHR more efficiently.

320. The burdens created by Epic's architecture affect patients across the healthcare system.

321. These harms are particularly severe for disabled individuals who rely on comprehensive medical documentation in order to obtain disability benefits or other forms of financial assistance.

322. Disabled individuals must often assemble medical records from multiple hospitals, specialists, and healthcare providers in order to demonstrate the severity and duration of their impairments.

323. By fragmenting medical records across provider-specific portals and limiting interoperability, Epic's systems create barriers that delay or prevent disabled individuals from assembling the medical evidence required by federal law.

324. Epic's conduct therefore harms both competition and consumers, while disproportionately affecting disabled individuals who depend on timely access to medical records.

---

**P. Epic Cannot Invoke Regulatory Exceptions to Justify Its Conduct**

325. The 21st Century Cures Act prohibits "information blocking," defined as practices that are likely to interfere with, prevent, or materially discourage access, exchange, or use of electronic health information ("EHI"). 42 U.S.C. § 300jj-52(a).

47

326. Congress directed ONC to implement regulations ensuring that patients and authorized third parties can access medical records electronically without artificial technological or contractual barriers.

327. ONC's regulations prohibit health IT developers of certified HER technology from engaging in conduct that knowingly interferes with the access, exchange, or use of electronic health information. 45 C.F.R. § 171.103.

328. To ensure the rule could not be easily evaded, ONC created limited and narrowly construed exceptions for specific circumstances, such as protecting patient privacy, preventing security risks, or maintaining system integrity. 45 C.F.R. §§ 171.201–171.303.

329. These exceptions are affirmative defenses that apply only when the actor can demonstrate strict compliance with detailed regulatory requirements. The exceptions do not permit conduct designed to advance competitive advantage, maintain market control, or impose unnecessary technical barriers to interoperability.

330. Epic's practices, such as requiring individual MyChart portal authentication for each health system, restricting access through proprietary portals, and limiting the ability of authorized IAS platforms to retrieve electronic health information across systems, are not required by federal law and are not mandated by the TEFCA Common Agreement.

331. Under the interoperability framework established by Congress and implemented by ONC, authorized IAS platforms that meet identity verification and security standards are permitted to retrieve electronic health information on behalf of patients.

332. Epic nevertheless imposes additional proprietary barriers that fragment access to records and require separate authentication through each provider's MyChart instance, even when the

requesting party has already completed identity verification through a certified intermediary service.

333. These barriers are technologically unnecessary and directly undermine the purpose of the interoperability framework, which was designed to enable the electronic aggregation of patient records across providers.

334. Epic's conduct therefore cannot be justified as a privacy or security measure, because federal regulations already provide standardized identity verification mechanisms for authorized intermediaries. Epic's additional requirements serve no legitimate privacy purpose and instead function to preserve Epic's control over patient data flows.

335. Epic's restrictions benefit Epic commercially by ensuring that access to patient records remains dependent on Epic-controlled portals and infrastructure.

336. By forcing patients and authorized representatives to obtain records through fragmented MyChart portals, Epic preserves its position as the gatekeeper for the largest repository of electronic health information in the United States.

337. These practices increase switching costs for healthcare providers, limit the ability of third-party interoperability services to compete, and prevent the development of technologies that could aggregate medical records across health systems.

338. Conduct designed to maintain market dominance or exclude competing interoperability solutions is not protected by the regulatory exceptions to the information-blocking rule.

339. Because Epic's conduct was undertaken to preserve its control over data access and interoperability infrastructure, not to comply with regulatory requirement, the conduct falls outside the scope of any lawful exception under the Cures Act or ONC regulations.

340. Courts have repeatedly held that regulatory frameworks do not immunize anticompetitive conduct unless Congress clearly intended to displace the antitrust laws.

341. Nothing in the Cures Act, TEFCA, or ONC's implementing regulations authorizes health IT developers to restrict access to electronic health information for competitive reasons.

342. To the contrary, the statutory and regulatory framework was enacted specifically to eliminate technological barriers to interoperability and prevent dominant EHR vendors from using proprietary systems to control the exchange of health information.

343. Epic therefore cannot invoke regulatory compliance as a defense to liability where its practices directly undermine the interoperability regime Congress enacted.

---

## V. Associational Standing of AADJ

344. Plaintiff, AADJ is a nonprofit organization dedicated to improving access to justice, healthcare information, and disability benefits for individuals with disabilities.

345. AADJ's mission focuses almost entirely on helping disabled individuals obtain medical records necessary to pursue disability benefits, coordinate medical care, and access government benefits.

346. Individuals with disabilities frequently require medical records from multiple healthcare providers to demonstrate eligibility for disability benefits administered by the Social Security Administration and other programs.

347. AADJ's members include disabled individuals, their family members, and caretakers.

348. Epic's conduct has impaired AADJ's ability to fulfill its mission by preventing the development and deployment of interoperability tools designed to improve medical record retrieval for disabled individuals.

349. AADJ has diverted organizational resources to address barriers created by Epic's architecture, including efforts to develop technological solutions and advocate for improved access to medical records.

350. AADJ brings this action on behalf of its members.

351. AADJ's members would have standing to bring these claims individually because they have suffered concrete injuries caused by Epic's restrictions on medical record access and interoperability.

352. These injuries include delays or barriers in obtaining medical records necessary for disability claims and healthcare coordination.

353. The interests AADJ seeks to protect in this action are germane to the organization's mission of improving access to medical records and disability justice for individuals with disabilities.

354. The claims asserted in this action do not require the participation of individual members because the relief sought, including injunctive relief and structural remedies affecting Epic's interoperability practices, will benefit AADJ's members generally.

355. AADJ therefore has associational standing to bring this action on behalf of its members.

---

## VI. Class Allegations

356. Plaintiffs bring this action on behalf of themselves, and all others similarly situated pursuant to Federal Rule of Civil Procedure 23.

**Class Definition**

357. All disabled individuals in the United States, and their parents, guardians, caregivers, or estates, who from October 6, 2022 (mandated full compliance with 21st Century Cures Act), to the present, who had electronic health information stored by, maintained by or connected to Epic, and who experienced delay, denial, incomplete production, excessive barriers, or other interference with access to such records.

358. Excluded from the Class are Defendant Epic Systems Corporation, its affiliates, officers, directors, employees, and agents, as well as the Court and its staff.

**Numerosity**

359. Epic's electronic health record systems contains records of 250 million Americans.

360. The number of individuals affected by Epic's interoperability restrictions is therefore so large that joinder of all members is impracticable.

**Commonality**

361. Common questions of law and fact include:

  a. whether Epic's policies violates federal interoperability requirements

  b. whether Epic uses privacy concerns as a pretext to limit data access

  c. whether Epic's conduct constitutes monopolization

  d. whether Epic's conduct caused harm to disabled individuals

**Typicality**

362. Plaintiffs' claims are typical of the claims of the Class because all Class members were harmed by the same conduct, Epic's restrictions on the exchange of electronic health information.

**Adequacy**

363. Plaintiffs will fairly and adequately protect the interests of the Class.

**Rule 23 Class Requirements**

364. The requirements of Federal Rule of Civil Procedure 23 are satisfied.

**Common Mechanism of Harm**

365. Epic's interoperability restrictions cause systemic barriers to assembling complete medical records needed to document disability. Disabled individuals frequently receive care from multiple healthcare providers and must obtain longitudinal medical records in order to support disability benefits applications and secure disability-related services.

366. When electronic health information stored in Epic systems cannot be exchanged or assembled electronically, claimants must request records manually from individual providers. This process delays the collection of medical evidence necessary to document disability.

367. These delays result in numerous harms to Class members, including:

   a. delayed disability benefit determinations;

   b. delayed access to disability services and public benefits;

   c. out-of-pocket costs associated with repeated manual record requests;

   d. increased administrative burdens on disabled individuals and caregivers;

   e. delays in care coordination across multiple providers; and

   f. prolonged periods without financial or medical support while disability claims remain pending.

368. In some cases, disability claimants died before their claims were adjudicated while awaiting the medical documentation necessary to support their applications.

**Common Discovery**

369. Epic's liability may be proven through common evidence, including:

   a. uniform portal architecture;

   b. interoperability functionality;

c. system design documentation;

d. federal interoperability requirements;

e. provider agreements;

e. expert analysis of access limitations.

370. Courts routinely certify classes where uniform technological practices affect consumers in the same manner.

---

## VII. CAUSES OF ACTION

### COUNT I: Monopolization: Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)

371. Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

372. Defendant Epic Systems Corporation possesses monopoly power in the relevant market for enterprise electronic health record systems used by hospitals and large health systems in the United States.

373. Epic's EHR systems store or control electronic medical records for a substantial portion of the United States population.

374. Epic's market power is reinforced by significant barriers to entry, including:

a. high switching costs for hospitals once an EHR system is installed;

b. network effects created by Epic-to-Epic data exchange;

c. extensive integration between Epic systems and hospital clinical infrastructure.

375. Epic has willfully acquired and maintained this monopoly power through exclusionary conduct rather than through competition on the merits.

376. Epic's exclusionary conduct includes, but is not limited to:

a. restricting interoperability with competing health technology platforms;

b. limiting third-party access to medical records stored within Epic systems;

c. structuring patient portals and authentication systems in a manner that prevents efficient aggregation of patient medical records;

d. imposing technological and architectural barriers that prevent independent interoperability platforms from retrieving records across Epic hospitals; and

e. leveraging its control over hospital EHR systems to restrict competition in adjacent markets for medical record access and health data interoperability.

377. These actions prevent competing platforms from accessing medical records necessary to compete in markets for medical record aggregation, health data exchange, and patient record access services.

378. Epic's conduct therefore constitutes unlawful monopolization in violation of Section 2 of the Sherman Act.

## COUNT II: Attempted Monopolization: Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)

379. Plaintiffs repeat and reallege the preceding paragraphs.

380. Epic has engaged in exclusionary conduct with the specific intent to monopolize adjacent markets for health data access, interoperability services, and medical record aggregation platforms.

381. Epic has undertaken this conduct by:

a. blocking or restricting third-party access to Epic-controlled medical records;

b. steering hospitals toward Epic-controlled data exchange tools;

c. preventing independent platforms from aggregating records across Epic systems.

382. Epic's conduct demonstrates a dangerous probability of success because Epic's dominance in hospital EHR systems gives it the ability to control the technological pathways through which patient medical records are accessed.

383. Epic's conduct therefore constitutes attempted monopolization in violation of Section 2 of the Sherman Act.

## COUNT III: Unlawful Maintenance of Monopoly Power: Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)

384. Plaintiffs repeat and reallege the preceding paragraphs.

385. Even if Epic initially obtained its market share through lawful means, Epic has unlawfully maintained that monopoly through exclusionary conduct.

386. Epic maintains its monopoly by restricting interoperability and preventing competing platforms from efficiently accessing medical records stored within Epic systems.

387. Epic's technological architecture fragments patient records across provider-specific portals and requires patients and third parties to retrieve records separately from each provider.

388. These restrictions raise rivals' costs and prevent competitors from developing platforms capable of aggregating medical records across healthcare providers.

389. Epic's conduct forecloses competition in markets for health data interoperability and patient record aggregation.

390. Epic's actions therefore constitute unlawful maintenance of monopoly power in violation of Section 2 of the Sherman Act.

**COUNT IV: Monopolization: Violation of the Texas Free Enterprise and Antitrust Act (Tex. Bus. & Com. Code § 15.05)**

391. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

392. The Texas Free Enterprise and Antitrust Act ("TFEAA"), Tex. Bus. & Com. Code § 15.05, prohibits monopolization and attempts to monopolize trade or commerce within the State of Texas.

393. The TFEAA is interpreted in harmony with federal antitrust law, including Section 2 of the Sherman Act.

394. Epic possesses monopoly power in the relevant market for enterprise electronic health record systems used by hospitals and health systems in the United States and within the State of Texas.

395. Epic's EHR systems store and control electronic medical records for a substantial portion of patients receiving healthcare services in Texas.

396. Epic has willfully acquired and maintained this monopoly power through anticompetitive and exclusionary conduct.

397. Epic's exclusionary conduct includes, but is not limited to:

    a. restricting interoperability with competing health technology platforms;

    b. limiting independent IAS platform access to medical records stored within Epic systems;

    c. structuring patient portal architecture in a manner that fragments medical records across separate provider-specific portals;

    d. imposing technological barriers that prevent efficient aggregation of medical records across healthcare providers; and

e. leveraging its dominance in hospital EHR systems to restrict competition in adjacent markets for health data access and medical record interoperability.

398. Epic's conduct has foreclosed competition in markets for medical record aggregation, interoperability services, and patient record access platforms.

399. Epic's actions have restrained trade and commerce affecting Texas healthcare providers, patients, and third-party platforms seeking access to medical records.

400. Plaintiffs and members of the Class have suffered injury to their business or property as a result of Epic's monopolistic conduct.

401. Epic's conduct therefore constitutes monopolization in violation of the Texas Free Enterprise and Antitrust Act.

---

**COUNT V: Attempted Monopolization: Violation of the Texas Free Enterprise and Antitrust Act (Tex. Bus. & Com. Code § 15.05)**

402. Plaintiffs incorporate by reference the preceding paragraphs.

403. Epic has engaged in exclusionary and anticompetitive conduct with the specific intent to monopolize adjacent markets for medical record access, health data interoperability, and medical record aggregation platforms.

404. Epic has undertaken this conduct by restricting interoperability pathways and limiting access to medical records stored within Epic systems.

405. Epic's conduct has created a dangerous probability that Epic will monopolize markets for patient EHR access and health data interoperability services.

406. Epic's dominance in hospital EHR systems provides Epic with the ability to control the technological pathways through which medical records are accessed and exchanged.

407. Epic's actions therefore constitute attempted monopolization in violation of the Texas Free Enterprise and Antitrust Act.

---

## COUNT VI: Denial of Access to an Essential Facility: Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)

408. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

409. Section 2 of the Sherman Act prohibits monopolists from denying competitors access to essential facilities where such access is necessary to compete.

410. Epic's electronic health record infrastructure constitutes an essential facility because it stores and controls access to medical records for a substantial portion of the United States population.

411. Access to these medical records is necessary for competitors to provide services that aggregate patient records, enable interoperability, or facilitate medical record retrieval across healthcare providers.

412. Competitors cannot reasonably replicate Epic's installed base of hospital EHR systems or the medical records stored within those systems.

413. Epic has denied or restricted access to this essential infrastructure through technological barriers, portal fragmentation, and limitations on third-party interoperability.

414. Epic's conduct prevents competing platforms from accessing medical records stored within Epic systems on fair and reasonable terms.

415. Epic's denial of access to this essential facility has foreclosed competition in markets for health data interoperability, medical record aggregation, and patient record access services.

416. Epic's conduct therefore constitutes unlawful monopolization under Section 2 of the Sherman Act.

**COUNT VI: Violation of the Americans with Disabilities Act (42 U.S.C. § 12182 (Title III))**

417. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

418. Title III of the Americans with Disabilities Act prohibits discrimination against individuals with disabilities in places of public accommodation.

419. Healthcare services are places of public accommodation within the meaning of the ADA.

420. Hospitals and healthcare systems across the United States provide access to patient medical records through Epic's MyChart platform.

421. MyChart functions as the primary digital interface through which patients access healthcare information maintained by Epic hospitals.

422. Because Epic's software platform governs the technological pathways through which patients access their medical records, Epic plays a central role in determining whether disabled individuals can meaningfully access those records.

423. Epic designed and maintains MyChart in a manner that creates substantial barriers for disabled individuals seeking to access medical records.

424. These barriers include, but are not limited to:

    a. fragmented portals requiring separate accounts for each provider;

    b. complex authentication procedures and two-factor verification requirements;

    c. identity verification procedures that rely on mailed activation codes or phone-based authentication;

d. inconsistent proxy access policies that prevent caregivers or representatives from retrieving records on behalf of disabled patients; and

e. web interfaces that may be difficult for individuals with visual impairments, cognitive disabilities, or limited digital literacy to navigate.

425. These barriers disproportionately affect individuals with disabilities who may rely on caregivers or assistive technologies to access medical information.

426. By designing its patient portal architecture in this manner, Epic has failed to provide disabled individuals with equal access to medical record systems used by hospitals and healthcare providers.

427. Epic has therefore denied disabled individuals the full and equal enjoyment of services provided through Epic's patient portal infrastructure.

428. Epic's conduct violates Title III of the Americans with Disabilities Act.

---

## COUNT VIII: Violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794)

429. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

430. Section 504 of the Rehabilitation Act prohibits discrimination against individuals with disabilities in programs or activities receiving federal financial assistance.

431. Hospitals and healthcare systems that utilize Epic's electronic health record systems receive substantial federal funding, including funding through Medicare and Medicaid.

432. Epic provides the software infrastructure through which these federally funded healthcare providers store and manage electronic medical records.

433. Epic's MyChart platform serves as the primary mechanism through which patients access medical records maintained by these federally funded healthcare programs.

434. Disabled individuals must access their medical records in order to obtain healthcare services and demonstrate eligibility for federal disability benefits.

435. Epic's software architecture prevents disabled individuals from efficiently accessing and aggregating medical records across healthcare providers.

436. These barriers disproportionately affect individuals with disabilities who rely on caregivers, representatives, or assistive technologies to obtain medical records.

437. Epic's conduct therefore denies disabled individuals meaningful access to healthcare information provided through federally funded healthcare programs.

438. By maintaining a medical record access system that creates barriers for disabled individuals, Epic has discriminated against individuals with disabilities in violation of Section 504 of the Rehabilitation Act.

---

**COUNT IX: Information Blocking in Violation of the 21st Century Cures Act (42 U.S.C. § 300jj–52)**

439. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

440. Congress enacted the 21st Century Cures Act to promote interoperability of electronic health information and prevent practices that interfere with the access, exchange, or use of electronic health records.

441. The statute prohibits "information blocking," defined as practices that are likely to interfere with access, exchange, or use of electronic health information.

442. The Office of the National Coordinator for Health Information Technology ("ONC") has implemented regulations prohibiting health information technology developers from engaging in practices that unreasonably limit interoperability or restrict access to electronic health records.

443. Epic is a developer of certified health information technology within the meaning of the statute.

444. Epic's electronic health record systems and patient portal infrastructure control access to electronic health information maintained by hospitals and healthcare providers.

445. Epic has engaged in practices that interfere with the access, exchange, and use of electronic health information.

446. These practices include:

a. restricting interoperability with third-party IAS technology platforms;

b. imposing technological barriers that prevent efficient aggregation of medical records across healthcare providers;

c. designing patient portal architecture that fragments patient records across provider-specific portals; and

d. limiting the ability of third-party applications to retrieve electronic health records stored within Epic systems.

447. These practices interfere with the ability of patients and third-party platforms to access and exchange electronic health information.

448. Epic's conduct is inconsistent with the interoperability goals of the 21st Century Cures Act and the implementing regulations governing certified health information technology.

449. Epic's actions therefore constitute information blocking within the meaning of federal interoperability law.

450. Plaintiffs seek injunctive relief requiring Epic to cease practices that interfere with the access, exchange, and use of electronic health information.

---

## VIII. Prayer for Relief

451. WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and grant the following relief:

a. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives, and appoint undersigned counsel as Class Counsel;

b. Declare that Defendant's conduct as alleged herein violates the Sherman Act, 15 U.S.C. § 2, applicable federal interoperability and information-blocking laws, and any applicable state antitrust and consumer protection laws;

c. Enter appropriate injunctive and declaratory relief prohibiting Defendant from continuing the anticompetitive and exclusionary conduct described in this Complaint;

d. Order Defendant to cease practices that interfere with or materially discourage the access, exchange, or use of electronic health information, including practices that require fragmented portal authentication or otherwise prevent authorized third-party intermediaries from electronically aggregating patient medical records across health systems;

e. Order Defendant to eliminate contractual, technological, and policy barriers that prevent interoperable access to electronic health information and restore competitive conditions in the health information exchange market.

f. Require Defendant to implement interoperable data-access practices consistent with federal interoperability standards and the purposes of the 21st Century Cures Act and TEFCA framework;

g. Award Plaintiffs and the Class all damages permitted under law, including treble damages where authorized under federal antitrust statutes;

h. Award restitution and disgorgement of Defendant's unlawfully obtained revenues to the extent permitted by law;

i. Award Plaintiffs and the Class pre-judgment and post-judgment interest as permitted by law;

j. Award Plaintiffs and the Class their reasonable attorneys' fees, costs, and litigation expenses, including expert fees, as permitted by law;

k. Grant such further legal or equitable relief as the Court deems just and proper.

## IX. Jury Demand

452. Plaintiffs hereby demand a trial by jury on all claims and issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## X. Conclusion

453. Defendant has leveraged its dominance in the electronic health records market to impose technological barriers that fragment patient data, restrict interoperability, and prevent authorized access to medical records. These barriers undermine the federal interoperability

framework and cause direct harm to disabled individuals and others who depend on timely

access to complete medical records to document their health conditions and obtain critical

benefits.

454. Plaintiffs bring this action to restore lawful competition, eliminate unlawful barriers to

access, and ensure that patients and authorized representatives can obtain medical records in

the manner Congress intended when it enacted the nation's interoperability laws.

455. Accordingly, Plaintiffs respectfully request that the Court grant the relief set forth

above.

Respectfully submitted,

s/ Maren Miller Bam
Maren Miller Bam
WSB: 42264
Salus Law, PLLC
723 The Parkway
Richland, WA 99352
Email: maren@salusdisability.com
Telephone: (206) 485-4066
Facsimile: 206-260-9136
Counsel for Plaintiffs and Proposed Class