## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| THE AMERICAN ASSOCIATION FOR DISABILITY JUSTICE ("AADJ"), ON BEHALF OF ITS MEMBERS AND ALL OTHER SIMILARLY SITUATED; LARRY MILLER ON BEHALF OF THE ESTATE OF JOHN MILLER; AND JOHN HODGES; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § § § § § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § § | CIVIL ACTION NO. 1:26-cv-00564-RP |
| EPIC SYSTEMS CORPORATION, AND THEIR AFFILIATES, SUBSIDIARIES, AND PARENT COMPANIES, | § § § § § | ORAL ARGUMENT REQUESTED |
| Defendant. | § § | |

**DEFENDANT EPIC SYSTEMS CORPORATION'S**
**MOTION TO DISMISS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT...................................................................................................1

BACKGROUND .......................................................................................................................5

      A.      Epic Revolutionized Healthcare Through Its EHR Software. ..................................5

      B.      Epic Pioneered Nationwide Health Information Exchange. ....................................5

      C.      MyChart Simplified Patient Access to Medical Records.........................................6

      D.      MyChart Is Used for Access to Disability Benefits. ................................................7

LEGAL STANDARD ................................................................................................................8

ARGUMENT .............................................................................................................................9

I.      PLAINTIFFS' ANTITRUST CLAIMS (COUNTS I–VI) SHOULD BE
DISMISSED. ..................................................................................................................9

      A.      Plaintiffs Fail To Plausibly Allege Anticompetitive Conduct (Counts I–
V). ..........................................................................................................................9

            1.      Product Design Is Not Actionable Anticompetitive Conduct. ...................10

            2.      Epic Has No Duty To Deal with Competitors...........................................12

      B.      Plaintiffs Fail To Plausibly Allege a Relevant Product Market for Their
Attempted Monopolization Claims (Counts II and V). .........................................15

      C.      Plaintiffs Fail To Plausibly Allege Monopoly Power in the Purported
Enterprise EHR Software Market (Counts I, III, and IV)......................................17

      D.      Plaintiffs Fail To Plausibly Allege Antitrust Injury in the Purported
Enterprise EHR Software Market (Counts I, III, and IV)......................................18

      E.      Plaintiffs Fail To State a Claim for Denial of Access to an Essential
Facility (Count VI)................................................................................................21

II.      PLAINTIFFS' STATUTORY CLAIMS (COUNTS VII–IX) SHOULD BE
DISMISSED. ................................................................................................................22

      A.      Plaintiffs Fail To State a Claim Under the Americans with Disabilities
Act (Count VII).....................................................................................................22

      B.      Plaintiffs' Claim Under the Rehabilitation Act Fails (Count VIII). .......................23

      C.      There Is No Private Right of Action Under the Cures Act (Count IX)..................24

CONCLUSION........................................................................................................................25

**DEFENDANT'S MOTION TO DISMISS – Page ii**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*,
  776 F.3d 321 (5th Cir. 2015) ...................................................................................16

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) .................................................................................21

*AIDS Healthcare Found., Inc. v. Gilead Scis., Inc.*,
  No. C 16-00443 WHA, 2016 WL 3648623 (N.D. Cal. July 6, 2016), *aff'd*, 890 F.3d
  986 (Fed. Cir. 2018) ................................................................................................12

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ...........................................................................................24, 25

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991, 999 (9th Cir. 2010) ...........................................................................10

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
  300 F.3d 620 (5th Cir. 2002) ...........................................................................8, 9, 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................2, 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................................................8

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*,
  49 F.4th 520 (5th Cir. 2022) .............................................................................8, 9, 17

*Bullock v. Univ. of Tex. at Arlington*,
  No. 22-10013, 2024 WL 637474 (5th Cir. Feb. 15, 2024) .......................................23

*Clean Water Opportunities, Inc. v. Willamette Valley Co.*,
  759 F. App'x 244 (5th Cir. 2019) .........................................................................9, 17

*Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*,
  679 F.2d 516 (5th Cir. 1982) ...................................................................................18

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
  123 F.3d 301 (5th Cir. 1997) ...................................................................................19

*Fed. Trade Comm'n v. Facebook, Inc.*,
  560 F. Supp. 3d 1 (D.D.C. 2021).............................................................................18

*Fed. Trade Comm'n v. Meta Platforms, Inc.*,
   811 F. Supp. 3d 67 (D.D.C. 2025) ..................................................................................18

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
   703 F.2d 534 (9th Cir. 1983) ...........................................................................................10

*Frame v. City of Arlington*,
   657 F.3d 215 (5th Cir. 2011) ...........................................................................................23

*Guardian Flight, L.L.C. v. Health Care Serv. Corp.*,
   140 F.4th 271 (5th Cir. 2025) .....................................................................................24, 25

*Hernandez v. Smith*,
   793 F. App'x 261 (5th Cir. 2019) .....................................................................................24

*In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*,
   429 F. Supp. 2d 752 (E.D. La. 2005) ...............................................................................13

*In re Google Digit. Advert. Antitrust Litig.*,
   721 F. Supp. 3d 230 (S.D.N.Y. 2024)...............................................................................19

*Intus Care, Inc. v. RTZ Assocs., Inc.*,
   No. 24-CV-01132-JST, 2024 WL 2868519 (N.D. Cal. June 5, 2024) ...................................25

*Johnson v. Sawyer*,
   47 F.3d 716 (5th Cir. 1995) ...............................................................................................6

*Lightbourn v. County of El Paso*,
   118 F.3d 421 (5th Cir. 1997) ...........................................................................................23

*Magee v. Coca-Cola Refreshments USA, Inc.*,
   833 F.3d 530 (5th Cir. 2016) ...........................................................................................22

*McAllister v. Mansoor*,
   No. 2:25-CV-11965, 2026 WL 859806 (E.D. Mich. Jan. 20, 2026), *report and
   recommendation adopted*, 2026 WL 855154 (E.D. Mich. Mar. 27, 2026) ...........................25

*MedioStream, Inc. v. Microsoft Corp.*,
   869 F. Supp. 2d 1095 (N.D. Cal. 2012) .......................................................................11, 12

*MLW Media LLC v. World Wrestling Ent., Inc.*,
   655 F. Supp. 3d 946 (N.D. Cal. 2023) ..............................................................................16

*Norris v. Hearst Tr.*,
   500 F.3d 454 (5th Cir. 2007) .......................................................................................19, 20

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ........................................................................................13

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)...................................................................................................15

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)...............................................................................................13, 14

*Power Analytics Corp. v. Operation Tech., Inc.*,
    820 F. App'x 1005 (Fed. Cir. 2020) ........................................................................11

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
    131 F.4th 205 (4th Cir. 2025) ..................................................................................25

*Redbox Automated Retail, LLC v. Buena Vista Home Ent., Inc.*,
    399 F. Supp. 3d 1018 (C.D. Cal. 2019) ...................................................................18

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    842 F.3d 883 (5th Cir. 2016) ...................................................................................11

*Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*,
    786 F. Supp. 2d 1190 (S.D. Tex. 2009) ...................................................................18

*Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*,
    802 F. Supp. 1544, 1551 (S.D. Tex. 1991) ..............................................................18

*Rx Sols., Inc. v. Caremark, L.L.C.*,
    164 F.4th 436 (5th Cir. 2026) ..................................................................................19

*SafeLease Ins. Servs. LLC v. Storable, Inc.*,
    No. 25-BC03A-0001, 2025 WL 2018465 (Tex. Bus. Ct. July 18, 2025)................21

*Shah v. VHS San Antonio Partners, L.L.C.*,
    985 F.3d 450 (5th Cir. 2021) ...................................................................................15

*Simon & Simon, PC v. Align Tech., Inc.*,
    No. CV 19-506 (LPS), 2020 WL 1975139 (D. Del. Apr. 24, 2020) .......................13

*Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
    171 F.3d 912 (3d Cir. 1999).....................................................................................10

*Stearns Airport Equip. Co. v. FMC Corp.*,
    170 F.3d 518 (5th Cir. 1999) .....................................................................................9

*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*,
    477 U.S. 597 (1986)..................................................................................................23

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919)..................................................................................................12

**DEFENDANT'S MOTION TO DISMISS – Page v**

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
 No. 14-CV-00804, 2015 WL 5693735 (N.D. Ill. Sept. 18, 2015) ...........................................21

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
 540 U.S. 398 (2004)......................................................................................12, 13, 14, 21

*Waggoner v. Denbury Onshore, L.L.C.*,
 612 F. App'x 734 (5th Cir. 2015) .................................................................................19

*Wiggins v. La. St. Univ.—Health Care Servs. Div.*,
 710 F. App'x 625 (5th Cir. 2017) ..................................................................................25

*Witches Brew Tours LLC v. New Orleans Archdiocesan Cemeteries*,
 No. CV-21-2051, 2022 WL 3586757 (E.D. La. Aug. 22, 2022), *aff'd sub nom. New Orleans Ass'n of Cemetery Tour Guides & Companies v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026 (5th Cir. 2023).................................................................16

*Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*,
 331 F. Supp. 2d 513 (E.D. Tex. 2004)............................................................................21

*Zaid v. Smart Fin. Credit Union*,
 No. H-18-1130, 2019 WL 314732 (S.D. Tex. Jan. 24, 2019)................................................22

## Statutes & Rules

42 U.S.C. § 300jj-52 ...........................................................................................24, 25

45 C.F.R. § 164.514(h)(1)(i) ....................................................................................6

Fed. R. Civ. P. 12(b)(6)...........................................................................................8

Tex. Bus. & Com. Code § 15.04.................................................................................8

Tex. Civ. Prac. & Rem. Code § 16.062 .........................................................................24

**PRELIMINARY STATEMENT**

Epic is the leader in helping disability claimants send their electronic medical records to the Social Security Administration ("SSA") and has facilitated the exchange of medical records between providers and the SSA since 2011.  This allows the SSA to make benefits determinations for those claimants efficiently and with complete information.  In 2025 alone, 2.7 million records were directly sent to the SSA by providers that use Epic's electronic health record software ("EHR Software") to store patients' medical records.[1]  The Office of the Inspector General of the SSA itself recognized Epic's leadership, stating, the "SSA prioritizes adding partners who use Epic electronic health record software because Epic provides broad support for the data elements SSA needs to make disability determinations".[2]  Continuing its leadership, Epic was the first, and remains the only, EHR Software company to help providers exchange medical records with the SSA using the federally-sponsored exchange known as TEFCA (Trusted Exchange Framework and Common Agreement).[3]  (*See* ¶ 114.)[4]  Through TEFCA, patients have yet another way to

---

[1] Epic, *Care Everywhere*, https://www.epic.com/careeverywhere/ (last visited May 14, 2026).

[2] Soc. Sec. Admin. Office of Inspector Gen., *The Social Security Administration's Expansion of Health Information Technology to Obtain and Analyze Medical Records for Disability Claims, Audit A-01-18-50342*, at 10 (Jan. 3, 2022), https://www.oversight.gov/sites/default/files/documents/reports/2022-01/01-18-50342.pdf.

[3] *See* Off. of the Nat'l Coordinator for Health Info. Tech., *TEFCA*, https://healthit.gov/policy/tefca (last visited May 14, 2026); Nick Perrine, *Social Security Joins TEFCA Network to Improve Disability Decision Processing*, Soc. Sec. Admin. (Feb. 17, 2026), https://www.ssa.gov/news/en/advocates/2026-02-17.html; Epic, *Health systems on Epic are first to connect with the Social Security Administration through TEFCA* (Apr. 8, 2026), https://www.epic.com/epic/post/health-systems-on-epic-are-first-to-connect-with-the-social-security-administration-through-tefca/.

[4] All citations to Plaintiff's Class Action Complaint, filed March 9, 2026 (the "Complaint") are designated by "¶" and the relevant paragraph number(s).

**DEFENDANT'S MOTION TO DISMISS – Page 1**

authorize the SSA to obtain their electronic medical records directly from providers.[5]  TEFCA's

approach allows medical providers, who are the custodians of their patients' records, to comply

with their obligations under HIPAA and state law while providing patients and the SSA a

seamless way to interact.

This Complaint thus makes a strawman attack against the very leader in interoperable

exchange with the SSA.  But even accepting Plaintiffs' allegations as true, as Epic and the Court

must do for purposes of this motion only,[6] all nine of Plaintiffs' claims fail as a matter of law.

There are many deficiencies in Plaintiffs' Complaint; Epic focuses on only the most fundamental

deficiencies for purposes of this motion, each of which independently (and in the aggregate)

requires dismissal.

Plaintiffs purport to bring six antitrust claims, but their Complaint makes clear that their

alleged concerns have nothing to do with the antitrust laws.  The crux of the Complaint is that

Epic designs and licenses a suite of products that organize health records in a way that is

allegedly more "fragmented" than Plaintiffs would prefer.  Plaintiffs allege that Epic should have

designed its software to aggregate its customer organizations' patient data in a way that enables

patients to have a single sign-on experience, instead of allowing the healthcare provider

custodians to control access to those records through their separate copies of MyChart.  Again,

under HIPAA, medical providers (not Epic) are responsible for their patients' records and bear

---

[5] Steven Posnack & Sean Fry, *TEFCA: Accelerating Government Benefits Determination for a Better Tomorrow*, Off. of the Nat'l Coordinator for Health Info. Tech (Sept. 16, 2025), https://healthit.gov/blog/tefca/tefca-accelerating-government-benefits-determination-for-a-better-tomorrow/.

[6] *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief".).

**DEFENDANT'S MOTION TO DISMISS – Page 2**

responsibility for how those records are used or disclosed.  That is not *Epic's* "architecture", nor would it make sense to be, as each Epic customer is legally required to maintain records separate and apart from unaffiliated organizations.  In any event, even if the aspects of the system of which Plaintiffs complain were somehow Epic's design, Plaintiffs' complaints are plainly and simply beyond the reach of the antitrust laws.

*First*, and foremost, Plaintiffs fail to allege any cognizable form of anticompetitive conduct under the antitrust laws.  As a matter of black letter law, product design decisions are not actionable.  In addition, as another matter of black letter law, Epic has no duty to deal with its competitors at all, let alone design its products in a way that would make it easier for actual or would-be competitors to compete.  Yet that is all that Plaintiffs allege:  that Epic "constructed and maintained a technological ecosystem that fragments patient health data".  (¶ 117.)  That conduct cannot sustain monopolization or attempted monopolization claims.  (*Infra* Section I.A.)

*Second*, Plaintiffs claim that Epic is attempting to monopolize a purported market for "interoperable medical record access and aggregation" (the alleged "Medical Record Aggregation Market") (¶ 263), but the Complaint fails to allege that as a plausible market because it vacillates between whether this constitutes one market or some unspecified number of "adjacent" markets.  Moreover, the Complaint fails even to allege that Epic competes in this purported market.  To the contrary, the Complaint alleges that each instance of Epic's MyChart allows access to records from only a single provider, pleading that product out of any market for "platforms and services that allow patients and authorized entities to retrieve electronic health records from multiple healthcare providers".  (¶ 263.)  (*Infra* Section I.B.)

*Third*, Plaintiffs claim that Epic maintains monopoly power in a purported market for "enterprise EHR systems used by hospitals and large health systems" (the alleged "Enterprise

**DEFENDANT'S MOTION TO DISMISS – Page 3**

EHR Software Market") (¶ 251), but the Complaint alleges that Epic's market share in that supposed market is only 40% (¶ 77).  That market share is too small to support a claim of monopoly maintenance.  It *disproves* monopoly power as a matter of law.  (*Infra* Section I.C.)

*Fourth*, Plaintiffs fail to allege antitrust injury, *i.e.*, an injury of the type the antitrust laws are intended to prevent.  Plaintiffs—patients and an advocacy group for patients—are neither competitors nor consumers in the alleged Enterprise EHR Software Market.  It is thus no surprise that Plaintiffs allege no injury in that market; the only injury Plaintiffs allege is in the alleged Medical Record Aggregation Market.  Without any allegation of harm in the Enterprise EHR Software Market, the claims dependent on that alleged market fail as a matter of law.  (*Infra* Section I.D.)

*Fifth*, Plaintiffs' final antitrust claim is for denial of access to an essential facility.  Even if the essential facility doctrine were viable under the antitrust laws (a dubious proposition at best), this claim fails because Plaintiffs do not allege the predicate of any essential facility claim: a *complete denial of access*.  Plaintiffs allege only that the process for accessing those records is less than ideal from their perspective.  That is insufficient as a matter of law.  (*Infra* Section I.E.)

Plaintiffs' three non-antitrust claims are just as flawed.  *First*, Plaintiffs' claim under the Americans with Disabilities Act ("ADA") fails.  Under Fifth Circuit law, a place of public accommodation must be a *physical establishment*.  Plaintiffs' allegations are about Epic websites, patient portals, or mobile applications, which are not places of public accommodation for purposes of the ADA.  (*Infra* Section II.A.)  *Second*, Plaintiffs' claim under the Rehabilitation Act fails.  The single provision of the Act that Plaintiffs contend Epic violated applies *only* to businesses that receive federal funding, but the Complaint alleges that Epic's *customers* receive federal funding, not that Epic itself receives federal funding.  (*Infra* Section II.B.)  *Third*,

**DEFENDANT'S MOTION TO DISMISS – Page 4**

Plaintiffs' claim under the Cures Act fails because there is simply no private right of action under the Cures Act.  (*Infra* Section II.C.)

Plaintiffs have failed to plausibly allege any of their claims, and no amendment could cure the fundamental legal deficiencies that cut across all claims.  The Complaint should therefore be dismissed with prejudice.

## BACKGROUND

### A.    Epic Revolutionized Healthcare Through Its EHR Software.

Epic has a long history of developing EHR Software that allows healthcare providers, hospitals, and others to create, store, and exchange patient health records electronically and securely.  (*See* ¶¶ 53–54, 78–79, 81–82.)  The electronic health records maintained using EHR Software enable providers to accurately diagnose and treat their patients and allow patients to access the records they need.  (¶ 76.)

Healthcare providers license Epic's EHR Software to maintain their patients' medical records.  (*See* ¶¶ 63, 118.)  Each Epic customer maintains its own individual copy, or "instance", of Epic's software.  (¶¶ 118, 170.)  The medical records are not Epic's; that "data is owned by the patient and medical providers who treat or provide care to the patient".  (¶ 132.)

### B.    Epic Pioneered Nationwide Health Information Exchange.

Epic has long been a leader in healthcare interoperability—the exchange of electronic health records between providers to ensure that treatment is informed by a patient's full medical history.  More recently, Epic was among the first organizations to have a Qualified Health Information Network under TEFCA—the next-generation, government-sponsored interoperability framework.  (*See* ¶¶ 16–18, 114.)  TEFCA provides a single on-ramp toward universal interoperability, enabling providers, payers, the SSA, public health professionals, and patients to access and securely share health information regardless of where it is stored.

**DEFENDANT'S MOTION TO DISMISS – Page 5**

(*See* ¶¶ 16–18.)  This helps providers coordinate care and ensures that medical records follow the patient—even when switching providers or EHR vendors.  (*Id*.)

### C. MyChart Simplified Patient Access to Medical Records.

Epic's EHR Software also gives patients direct access to portions of their own medical records through Epic's patient-facing application, MyChart.  (¶¶ 55, 83, 433.)  Before implementing MyChart, healthcare providers operated their own portals or used third-party vendors that "often required complex integrations, additional security reviews, and ongoing maintenance".  (¶¶ 81–82.)  Epic designed MyChart to address these challenges, allowing providers to "simplify their technology stack and provide a single login and communication channel for patients".  (¶ 81.)  Because MyChart integrates with Epic's other EHR Software, it "could immediately display lab results, appointment information, medication lists, and visit summaries without additional development work".  (¶ 82.)  As a result, many providers "found it easier to adopt MyChart rather than maintain their own portal or integrate a competing product".  (*Id*.)

Today, millions of patients use MyChart as their primary way to access health information.  (¶ 83.)  But because providers—not Epic—are the custodians of their patients' data, each provider maintains its own instance of MyChart and chooses what information to share with patients via MyChart.  (*See* ¶¶ 118, 132, 170.)  Federal law requires each provider to "verify the identity of a person requesting protected health information and the authority of any such person to have access to protected health information" before disclosing personal health information. 45 C.F.R. § 164.514(h)(1)(i).[7]  Accordingly, as alleged by Plaintiffs, patients who receive care

---

[7] Courts can and do "take judicial notice of federal regulations".  *Johnson v. Sawyer*, 47 F.3d 716, 734 n.36 (5th Cir. 1995).

**DEFENDANT'S MOTION TO DISMISS – Page 6**

from multiple providers access their records by signing into each provider's instance of MyChart using dedicated provider-specific credentials.  (*See* ¶¶ 170–71, 174, 176.)

Plaintiffs characterize this system as "fragmentation" of patient records across providers and as "Epic's architecture".  But Plaintiffs' allegations are misplaced.  Epic's customers are the providers.  (*See* ¶ 113.)  Each Epic customer uses Epic's software to maintain its own database of patient health records, and that database is owned and controlled by the provider, not by Epic.  It is accordingly the provider, not Epic, that grants access to their patients' health records. (*See* ¶ 132.)  A bank provides its customers access to their financial records at that bank and not an aggregated view of their financial records across multiple financial institutions—*e.g.*, Citi, Chase, and Bank of America.  Similarly, if an individual has a private Gmail account as well as a Google-powered work email (or private and work Microsoft Outlook email accounts), Google (or Microsoft) would not combine these emails into a single account (or a single view) the individual can access with a single sign on; each would be maintained and credentialed separately, and any aggregated view would involve signing into each account separately.  So too a healthcare provider provides its patients access to their health data maintained by that provider and not across different healthcare systems—*e.g.*, CommUnityCare Health Centers and INTEGRIS Health.

### D.    MyChart Is Used for Access to Disability Benefits.

Demonstrating eligibility for disability benefits requires longitudinal medical evidence, often from multiple healthcare providers, documenting the severity and duration of a claimant's impairments.  (*See* ¶¶ 136, 142, 144–45.)  Historically, obtaining that evidence has been the most time-consuming part of the benefits determination process, often requiring paper-based requests to each provider, causing claims to remain pending for months.  (*See* ¶¶ 151, 154, 159–61.)

By developing EHR Software that allows providers to store and organize patient records electronically, Epic made it possible for medical evidence to be retrieved more efficiently. (¶¶ 78–79.)  Through MyChart, Epic enabled patients to directly request access to their medical records, allowing them to retrieve and submit medical evidence themselves rather than waiting for providers to respond to paper requests.  (¶¶ 81–83.)  Epic has also participated in the Health Information Technology Medical Evidence Request system, which allows the SSA to request medical records directly from providers electronically.  (¶¶ 156–60.)

**<u>LEGAL STANDARD</u>**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face".  *Iqbal*, 556 U.S. at 678.  But courts "don't accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions".[8]  *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice".  *Iqbal*, 556 U.S. at 678.  And where the alleged facts are "merely consistent with" alleged wrongdoing, the complaint "stops short of the line between possibility and plausibility" and should be dismissed.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Plaintiffs bring antitrust claims under both the Sherman Act (Counts I, II, III, and VI) and the Texas Free Enterprise and Antitrust Act ("TFEAA") (Counts IV and V).  Epic responds to these claims together because the TFEAA is "construed in harmony with federal judicial interpretations of comparable federal antitrust statutes".  Tex. Bus. & Com. Code § 15.04; *see also Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) ("Texas courts

---

[8] Unless noted, all emphasis is added, and internal citations and quotations are omitted.

**DEFENDANT'S MOTION TO DISMISS – Page 8**

are statutorily instructed to interpret the TFEAA in harmony with federal judicial interpretations of equivalent federal laws".).

**ARGUMENT**

### I.    PLAINTIFFS' ANTITRUST CLAIMS (COUNTS I–VI) SHOULD BE DISMISSED.

Plaintiffs purport to invoke the antitrust laws, but their allegations make clear that this simply is not an antitrust case.  Plaintiffs' core grievance, as alleged, is that Epic's MyChart does not function as they wish it did.  Plaintiffs' antitrust claims fail across the board because this grievance cannot be forced into the rubric of an antitrust claim.

### A.    Plaintiffs Fail To Plausibly Allege Anticompetitive Conduct (Counts I–V).

Each of Plaintiffs' first five antitrust claims—for monopolization, attempted monopolization, and unlawful maintenance of monopoly power—requires plausible allegations of cognizable anticompetitive conduct.  *See BRFHH Shreveport, LLC*, 49 F.4th at 529 (holding that both monopolization and attempted monopolization require a showing of anticompetitive conduct); *Clean Water Opportunities, Inc. v. Willamette Valley Co.*, 759 F. App'x 244, 248 (5th Cir. 2019) (holding that unlawful maintenance of monopoly requires that the defendant "acquired or maintained [monopoly] power willfully", which "requires a showing of exclusionary conduct" (citing *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999))).  Plaintiffs cannot satisfy this requirement.

The entirety of Plaintiffs' theory of anticompetitive conduct revolves around the allegation that Epic "constructed and maintained a technological ecosystem that fragments patient health data and restricts third-party access" (¶ 117) instead of using an alternative design (preferred by Plaintiffs) whereby patients and third parties could access all data for a given patient across all providers with a single sign-in (*see* ¶¶ 125, 227, 231–32).  That theory faults Epic for its product design decisions, and specifically for its purported refusal to design its

**DEFENDANT'S MOTION TO DISMISS – Page 9**

system in a way that best helps competitors— both of which are fatal to these antitrust claims. Product design is not actionable under the antitrust laws, and Epic has no duty under the antitrust laws to deal with its competitors at all, let alone on terms Plaintiffs (or competitors) prefer. Plaintiffs' failure to plausibly allege anticompetitive conduct is fatal to their first five claims.

**1.      Product Design Is Not Actionable Anticompetitive Conduct.**

Plaintiffs' theory of anticompetitive conduct fails because it is predicated on a critique of the design of Epic's product, which is not actionable under the antitrust laws.  Plaintiffs allege that "Epic's design and implementation of its systems . . . have created barriers to retrieving and aggregating medical records" (¶ 56); that "Epic designed and maintained an electronic health record architecture that fragments patient medical records . . . and limits the ability of patients and third-party platforms to aggregate those records" (¶ 167; *see also* ¶¶ 117, 119); and that Epic designed MyChart so as to maintain this fragmentation (*see, e.g.*, ¶¶ 118–19, 122–24, 133, 167, 170–72, 239, 294).  Plaintiffs also allege that Epic restricts third-party authentication and retrieval of patient data by maintaining this fragmented system as well as through the design and governance of its proprietary application programming interfaces ("APIs").  (*See* ¶¶ 126–31, 241–42, 287, 330, 332.)  Even if these allegations were true, they would fail because they constitute inactionable product design.

"As a general rule, any firm, even a monopolist, may bring its products to market whenever and however it chooses".  *Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 925 n.7 (3d Cir. 1999) (quoting *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545–46 (9th Cir. 1983)).  Moreover, "product introduction must be alleged to involve some associated conduct which constitutes an anticompetitive abuse".  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999 (9th Cir. 2010). Plaintiffs have alleged no such conduct here.  As the Fifth Circuit has held, a defendant cannot be

**DEFENDANT'S MOTION TO DISMISS – Page 10**

found to have harmed competition merely because a plaintiff alleges shortcomings in the defendant's product or proposes alternative designs that it claims are preferable. *See Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 897 (5th Cir. 2016) (finding "entirely illogical as a vehicle to prove exclusionary conduct" a theory that defendant harmed competition by continuing to sell a product with "design flaws" rather than "redesign the product to cure them"); *see also Power Analytics Corp. v. Operation Tech., Inc.*, 820 F. App'x 1005, 1017–18 (Fed. Cir. 2020) (affirming dismissal where plaintiff argued, *inter alia*, "that [defendant's] products [were] of a lower quality and [were] higher priced" because the "sale of inferior or higher priced products is not predatory conduct").

Plaintiffs' entire anticompetitive conduct theory is simply a repackaging of their product design complaints in antitrust vocabulary. (¶¶ 278–311.)  Plaintiffs allege that Epic's "MyChart architecture intentionally fragments patient records across provider-specific portals" (¶ 294); that "Epic preserves its control over how patient records are accessed and exchanged" by "requiring patients to access records through fragmented portals" (¶ 296); and that Epic "impose[s] technological restrictions on interoperability and patient record access" (¶ 308).  Each of these allegations describes an alleged feature of how Epic built, configured, or operates its software— that is, its product design[9]—and none identifies a discrete exclusionary act separate from that product design.  That is fatal to these claims.  *See MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1107–08 (N.D. Cal. 2012) (granting dismissal of an antitrust claim where plaintiff challenged defendant's product integration but failed to allege the design "did not provide a new benefit to consumers" or that defendant "engaged in actionable conduct" beyond

---

[9] Moreover, in reality, as described above, Plaintiffs are simply wrong to characterize this as a choice by Epic at all.  Providers are the custodians of their patients' records and are responsible under HIPAA for how those records are used.

**DEFENDANT'S MOTION TO DISMISS – Page 11**

the product improvement itself); *AIDS Healthcare Found., Inc. v. Gilead Scis., Inc.*, No. C 16-00443 WHA, 2016 WL 3648623, at *7 (N.D. Cal. July 6, 2016) (granting dismissal where "[plaintiff] fail[ed] to allege any anticompetitive conduct" beyond defendant's product design decision), *aff'd*, 890 F.3d 986 (Fed. Cir. 2018).

### 2.    Epic Has No Duty To Deal with Competitors.

Plaintiffs allege that Epic requires competitors to direct users to authenticate their identity through each provider's MyChart portal, and contend that Epic should instead allow third parties to aggregate patient records across all providers through a single interface. (*See, e.g.*, ¶¶ 126–27, 227, 231–32, 376.)  In this context, Plaintiffs allege that Epic "designs its systems so that data exchange occurs most efficiently between Epic systems while creating barriers to interoperability with competing platforms" (¶ 282); that Epic's "interoperability architecture favors Epic-to-Epic communication" over communication with Epic's competitors (¶ 283); and that Epic "imposes technical and architectural limitations on the ways in which third-party platforms can retrieve medical records" (¶ 289).  These allegations *assume* Epic has a legal duty under the antitrust laws to lend its competitors a helping hand by providing them with the best possible access to records that medical providers maintain using Epic EHR Software.  That assumption is wrong as a matter of antitrust law.

It is black letter law that Epic has no duty under the antitrust laws to deal with its competitors, or any given third party, *at all*.  Antitrust law "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal".  *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP* ("*Trinko*"), 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).  This no-duty-to-deal doctrine has been the law of the

**DEFENDANT'S MOTION TO DISMISS – Page 12**

land for over a century, and for good reason: firms are supposed to compete with their rivals, not help them. As the Supreme Court has explained:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.

*Trinko*, 540 U.S. at 407–08. The Supreme Court added that forcing such a firm to deal with a competitor "may facilitate the supreme evil of antitrust: collusion". *Id*. at 408. And where a firm does choose to deal with its competitors, such a firm certainly has no duty under the antitrust laws to design its products to meet competitors' preferences. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing".).

Courts routinely dismiss refusal-to-deal claims based on this black letter law. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) (Gorsuch, J.) (rejecting refusal-to-deal claims based on defendant's decision to stop providing its application program interfaces to application developers); *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 429 F. Supp. 2d 752, 758 (E.D. La. 2005) (dismissing claim where plaintiffs failed to plausibly allege anticompetitive conduct based on defendant's refusal to make test booklets and answer sheets available to competitors in the teacher certification testing market); *Simon & Simon, PC v. Align Tech., Inc.*, No. CV 19-506 (LPS), 2020 WL 1975139, at *7 (D. Del. Apr. 24, 2020) (dismissing for failure to plead anticompetitive conduct where plaintiff alleged defendant "should have designed its scanner to make it easier and cheaper for dental professionals to order scans from [defendant's] competitors", framing this as a "refusal to deal claim" and holding that the antitrust laws did not require the "[defendant] to lend its competitors a helping hand"). Epic's decisions concerning whether to provide access to its proprietary EHR Software, how to

**DEFENDANT'S MOTION TO DISMISS – Page 13**

provide access, and to whom to provide access are the kinds of independent, competitive business judgments that the antitrust laws *protect* rather than prohibit or regulate.

Plaintiffs' own allegations underscore their failure to allege any form of anticompetitive conduct recognized under the antitrust laws. Plaintiffs allege violations of the spirit and language of the Cures Act, the HITECH Act, and TEFCA, which are allegedly intended to facilitate information sharing and prevent information blocking. (*See, e.g.*, ¶¶ 3–18, 127, 325–43.) Taken as true for present purposes, those allegations demonstrate the *failure* to make out an antitrust claim—not the basis for one. A violation of an independent statutory regime does not state an antitrust claim; to the contrary, it supports the absence of such a claim. *Trinko* is illustrative. There, the plaintiffs alleged monopolization based on Verizon's failure to provide competing local exchange carriers timely access to Verizon's telephone network. The plaintiffs alleged that Verizon's conduct ran afoul of the Telecommunications Act of 1996, which required Verizon to share its network with competitors. The Supreme Court held that the plaintiffs failed to state a claim because an independent statutory regime "does not create new claims that go beyond existing antitrust standards" and that far from evidencing an antitrust violation, "a detailed regulatory scheme [outside the antitrust laws]. . . ordinarily raises the question whether the regulated entities are not shielded from antitrust scrutiny altogether by the doctrine of implied immunity". *Trinko*, 540 U.S. at 406–07; *see also linkLine Commc'ns*, 555 U.S. at 459 (Breyer, J., concurring) ("When a regulatory structure exists to deter and remedy anticompetitive harm, the costs of antitrust enforcement are likely to be greater than the benefits".). Plaintiffs' contention that Epic's conduct violates the Cures Act or other interoperability regimes undermines their claims; the antitrust laws do not provide a remedy.

**DEFENDANT'S MOTION TO DISMISS – Page 14**

### B. Plaintiffs Fail To Plausibly Allege a Relevant Product Market for Their Attempted Monopolization Claims (Counts II and V).

Plaintiffs "must define the relevant market" as "a prerequisite" to their antitrust claims. *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453–54 (5th Cir. 2021). "The relevant market is the area of effective competition in which the seller operates". *Id.* at 454. This requirement is critical because "[w]ithout a definition of the market[,] there is no way to measure the defendant's ability to lessen or destroy competition". *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018). Therefore, dismissal is appropriate where a plaintiff (1) "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand", or (2) "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor". *Apani Sw., Inc.*, 300 F.3d at 628.

Plaintiffs allege that Epic attempted to monopolize the Medical Record Aggregation Market (¶¶ 380, 403), which Plaintiffs allege consists of "platforms and services that allow patients and authorized entities to retrieve electronic health records from multiple healthcare providers" (¶ 263). But this definition fails as a matter of law for two primary reasons: Plaintiffs (1) inconsistently allege the market as both one and several, and (2) fail to identify any product Epic actually sells in the market.

*First*, Plaintiffs fail to allege a plausible antitrust market—sometimes alleging *one* market, other times *several*—offering shifting formulations throughout the Complaint.[10]

---

[10] Even where Plaintiffs describe a single market, their formulation of the products in that market is internally inconsistent—sometimes treating "interoperable access" and "medical record aggregation" as a conjoined service, but other times alleging them as distinct and complementary. (*Compare* ¶ 251 (defining "the market for interoperable access to electronic health records and medical record aggregation services"), *with* ¶ 100 (alleging that "competitors

**DEFENDANT'S MOTION TO DISMISS – Page 15**

(*Compare* ¶ 251 (alleging the market for "interoperable access to electronic health records and medical record aggregation services"), *with* ¶ 297 (alleging "adjacent markets for health data access, patient portals, and interoperability services"), *and* ¶ 312 (alleging "markets for electronic health record interoperability, medical record access, and health data exchange services").)  Plaintiffs cannot plausibly define a relevant market when they cannot even settle on its boundaries.  *See Witches Brew Tours LLC v. New Orleans Archdiocesan Cemeteries*, No. CV-21-2051, 2022 WL 3586757, at *5 n.55 (E.D. La. Aug. 22, 2022) (dismissing claim where "blatant inconsistency in pleading regarding the product and geographic markets" meant plaintiff did "not allege with reasonable definiteness facts from which this Court may infer conduct plausible to support a claim"), *aff'd sub nom. New Orleans Ass'n of Cemetery Tour Guides & Companies v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026 (5th Cir. 2023); *MLW Media LLC v. World Wrestling Ent., Inc.*, 655 F. Supp. 3d 946, 951–52 (N.D. Cal. 2023) (dismissing claim where "multiple formulations" of proposed market "further complicate[d] the question of the market's boundaries").

*Second*, Plaintiffs fail to plausibly allege that Epic sells any product in this market.  A firm cannot monopolize a market without competing in that market.  *See Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 335 (5th Cir. 2015) ("[T]he essential attributes of illegal monopoly power are judged by the monopolist's participation in the relevant market".).  This is because "[t]he ability to extract above-market profits from raised prices, the possession of large market share, and the ability to exclude one's competitors are all factors that could only apply to a party who participates in the relevant market".  *Id.*  Plaintiffs do at one

---

seeking to provide interoperability *or* record-aggregation services must interact with Epic's infrastructure").)

point suggest that MyChart and "ancillary services" are products in this market (¶ 265), but their own allegations contradict this assertion. The market is defined as "platforms and services that allow patients and authorized entities to retrieve electronic health records from *multiple* healthcare providers". (¶ 263.) Yet Plaintiffs allege that MyChart does the opposite—it supposedly "fragments" records across provider-specific instances of Epic software, each requiring separate sign-ons, rather than aggregating them. (*See, e.g.*, ¶ 170 ("MyChart is not a single national portal. Instead, each healthcare provider operating Epic maintains its own separate MyChart instance".), ¶ 171 ("[P]atients cannot obtain a unified set of medical records through a single Epic portal. Instead, patients must access each provider's portal *separately* and retrieve records *individually*".), ¶ 172 ("This fragmented system prevents patients and third-party platforms from efficiently aggregating a complete medical history across multiple healthcare providers".).) If MyChart does *not* allow patients to "retrieve electronic health records from multiple healthcare providers" (¶ 263),[11] then MyChart cannot be a product in the market Plaintiffs have defined and the two claims that depend on that alleged market fail.

C. **Plaintiffs Fail To Plausibly Allege Monopoly Power in the Purported Enterprise EHR Software Market (Counts I, III, and IV).**

Plaintiffs bring monopolization and unlawful maintenance of monopoly power claims in the purported Enterprise EHR Software Market (Counts I, III, and IV). To state these claims, Plaintiffs must plausibly allege "possession of monopoly power" in a properly defined relevant antitrust market. *BRFHH Shreveport, LLC*, 49 F.4th at 529; *Clean Water Opps., Inc.*, 759 F. App'x at 248. They fail to do so.

---

[11] And, of course, MyChart can only be used by providers that use Epic EHR Software, as opposed to other EHR Software, so the relevant universe could only consist of records maintained by providers that use Epic EHR Software and that license MyChart.

Market share is "the principal tool used by courts to determine the existence of monopoly power". *Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 521 (5th Cir. 1982). In the Fifth Circuit, "as a matter of law, a market share of less than 50 percent is insufficient for a monopolization claim". *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1197 (S.D. Tex. 2009) (collecting cases); *see also Fed. Trade Comm'n v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67, 122 (D.D.C. 2025) ("[C]ourts generally require a minimum market share of between 70% and 80%" to find monopoly power.). Here, Plaintiffs allege that Epic "owns over 40% of the market share" in the purported Enterprise EHR Software Market. (¶ 77.) That percentage falls far short of the threshold required to plead monopoly power, and thus, Plaintiffs' claim fails as a matter of law.[12] *See, e.g.*, *Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544, 1551 (S.D. Tex. 1991) (granting dismissal where plaintiff alleged 45% market share because "[a]s a matter of law, this allegation is insufficient to support a claim of monopolization in this circuit").

**D.      Plaintiffs Fail To Plausibly Allege Antitrust Injury in the Purported Enterprise EHR Software Market (Counts I, III, and IV).**

Plaintiffs' antitrust claims based on the alleged Enterprise EHR Software Market also fail because Plaintiffs do not plausibly allege antitrust injury. As discussed above, Plaintiffs have not

---

[12] Where a plaintiff alleges "over" a certain market share, courts do not infer a larger market share than the number alleged. *See, e.g.*, *Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021) (collecting cases) ("[Plaintiff] alleges only that [defendant] has maintained a dominant share of the [relevant market] (in excess of 60%) . . . and that no [competitor] of comparable scale exists . . . . These allegations—which do not even provide an estimated actual figure or range for [defendant's] market share at any point over the past ten year—ultimately fall short of plausibly establishing that [defendant] holds market power".); *Redbox Automated Retail, LLC v. Buena Vista Home Ent., Inc.*, 399 F. Supp. 3d 1018, 1029 (C.D. Cal. 2019) ("[Plaintiff] alleges that [defendant's] share of the [relevant] market is something 'greater' than fifty percent. Even if true, however, that fact is not sufficient to establish [defendant's] market power in the [relevant] market".).

**DEFENDANT'S MOTION TO DISMISS – Page 18**

alleged cognizable anticompetitive conduct, and there can be no antitrust injury where there is no anticompetitive conduct from which such injury could flow. *See Rx Sols., Inc. v. Caremark, L.L.C.*, 164 F.4th 436, 444 (5th Cir. 2026) (antitrust injury must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful"). Plaintiffs also fail to allege cognizable antitrust injury in the purported Enterprise EHR Software Market because the Complaint makes clear that they do not participate in that alleged market in any capacity. Accordingly, they do not and cannot allege any injury in that market, which means that the claims dependent on that market fail as a matter of law.

The Fifth Circuit construes antitrust injury "narrowly", *id.*, and plaintiffs are required to allege such injury in each market where they assert antitrust violations, *see Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997) (stating that antitrust injury "should be viewed from the perspective of the plaintiff's position *in the marketplace*"); *see also In re Google Digit. Advert. Antitrust Litig.*, 721 F. Supp. 3d 230, 244–48 (S.D.N.Y. 2024) (analyzing antitrust injury separately in each market where the plaintiffs alleged antitrust violations). Here, Plaintiffs allege no injury they suffered in the purported Enterprise EHR Software Market; instead, all their allegations of harm fall within the (insufficiently alleged) Medical Record Aggregation Market. Specifically, Plaintiffs allege that they are individuals who need to retrieve and aggregate medical records stored via EHR Software—not participants who build, buy, or sell EHR Software. (*See, e.g.*, ¶¶ 28–32, 38, 224–37, 322–24.)

Plaintiffs' failure in this regard is hardly surprising. Antitrust injury generally falls on "competitors, purchasers, or consumers *in the relevant market*". *Waggoner v. Denbury Onshore, L.L.C.*, 612 F. App'x 734, 737 (5th Cir. 2015); *see also Norris v. Hearst Tr.*, 500 F.3d 454, 465–66 (5th Cir. 2007) ("Parties whose injuries . . . are experienced in another market do not suffer

**DEFENDANT'S MOTION TO DISMISS – Page 19**

antitrust injury".).  None of the Plaintiffs is a competitor, purchaser, or consumer in the Enterprise EHR Software Market.  Plaintiff Larry Miller brought this action on behalf of his deceased son, John Miller, a disability claimant who received treatment through emergency departments and a low-income clinic.  (¶¶ 28–32.)  Plaintiff John Hodges is a Social Security disability benefits applicant who sought to obtain his medical records.  (¶ 38.)  And AADJ is a nonprofit organization that sought to build a portal to aggregate medical records for disabled individuals—not to design or procure enterprise EHR Software.  (¶¶ 224–37.)

Plaintiffs' own allegations confirm the point.  The injuries they allege—delays in assembling medical records, denials of disability benefits for "insufficient medical evidence" (¶ 198), barriers to aggregating records across provider-specific portals, and the inability of AADJ's Individual Access Services portal to retrieve records that providers use Epic software to maintain—are injuries experienced by end-users attempting to access data stored via EHR Software, not injuries suffered in the Enterprise EHR Software Market itself.  (*See, e.g.*, ¶¶ 193–94, 321–24.)  Indeed, the Complaint's antitrust injury section alleges that Epic's conduct "harms competition in purported markets for electronic health record interoperability, medical record access, and health data exchange services" (¶ 312)—markets that are, by Plaintiffs' own framing, distinct from the purported Enterprise EHR Software Market.

Because Plaintiffs neither build nor buy EHR Software, they are not competitors or consumers in the alleged Enterprise EHR Software Market.  Whatever injuries Plaintiffs may have experienced were "experienced in another market" and do not constitute cognizable antitrust injury in the alleged Enterprise EHR Software Market.  *Norris*, 500 F.3d at 465–66.  As such, all three of Plaintiffs' claims that are based on that market fail.

**DEFENDANT'S MOTION TO DISMISS – Page 20**

**E.    Plaintiffs Fail To State a Claim for Denial of Access to an Essential Facility (Count VI).**

The Supreme Court has "never recognized [the essential facilities] doctrine", *Trinko*, 540 U.S. at 410–11, nor have the Fifth Circuit or Texas courts, *see SafeLease Ins. Servs. LLC v. Storable, Inc.*, No. 25-BC03A-0001, 2025 WL 2018465, at *9 (Tex. Bus. Ct. July 18, 2025) ("Whether [Plaintiff] can prevail under such a theory is yet to be determined".). This should come as no surprise. By requiring firms to share facilities with competitors, the essential facilities doctrine contradicts the settled principle that "there is no duty to aid competitors". *Trinko*, 540 U.S. at 411. And the doctrine "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing". *Id.* at 408. Hence, courts have described the essential facilities doctrine as "troublesome, incoherent and unmanageable". *Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 513, 540 (E.D. Tex. 2004).

Even if the doctrine were recognized, Plaintiffs' allegations would fail under that doctrine's own (shaky) terms. "[T]he indispensable requirement for invoking the doctrine is the unavailability of access to the 'essential facilities'" for *competitors*. *Trinko*, 540 U.S. at 411. This requires "a complete denial of access or its functional equivalent". *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, No. 14-CV-00804, 2015 WL 5693735, at *12 (N.D. Ill. Sept. 18, 2015). Any access—even access requiring a "Kafkaesque" process—negates the doctrine, to the extent it existed at all. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1185 (9th Cir. 2016).

Here, Plaintiffs allege neither a denial of access by Epic nor that they are competitors of Epic. Plaintiffs allege only that Epic "make[s] it significantly more difficult for disabled individuals" to access their medical records (¶ 168) by fragmenting medical records across accounts (¶ 119); requiring patient verification and two-factor authentication (¶¶ 126, 179); and varying the layout of different MyChart portals (¶ 189). Those allegations plainly do not

**DEFENDANT'S MOTION TO DISMISS – Page 21**

constitute a complete denial of access for competitors.  Because Plaintiffs do not plausibly allege a complete denial of access for competitors, this claim should be dismissed.

## II.    PLAINTIFFS' STATUTORY CLAIMS (COUNTS VII–IX) SHOULD BE DISMISSED.

Plaintiffs bring non-antitrust claims under three federal statutes:  the ADA, Section 504 of the Rehabilitation Act, and the Cures Act.  The first two do not apply to the allegations here, and the third confers no private right of action.  Therefore, these claims should be dismissed.

### A.    Plaintiffs Fail To State a Claim Under the Americans with Disabilities Act (Count VII).

Plaintiffs allege that Epic "designs and maintains MyChart" in a way that violates Title III of the ADA.  (¶¶ 423, 428.)  But Title III does not apply to these allegations.  Title III applies only to "place[s] of public accommodation".  *Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530, 532 (5th Cir. 2016).  In the Fifth Circuit, places of public accommodation are limited to "*physical places* where goods or services are open to the public".  *Id.* at 534.  "[A] website is not a place of public accommodation under the ADA".  *Zaid v. Smart Fin. Credit Union*, No. H-18-1130, 2019 WL 314732, at *6 (S.D. Tex. Jan. 24, 2019) (holding that even where a bank has a brick-and-mortar location, the website associated with that bank is not itself a place of public accommodation).  Epic is not aware of any court within the Fifth Circuit that has held that a website, web portal, or mobile application is a place of public accommodation for purposes of the ADA.  Accordingly, Plaintiffs' ADA claim arising out of Epic's "digital interface" in MyChart (¶ 421) fails as a matter of law.  Plaintiffs conclusorily assert that "[h]ealthcare services are places of public accommodation".  (¶ 419.)  But Plaintiffs do not—and cannot—make the key allegation:  that "Epic's software platform" (¶ 422) is a "physical place[] where goods or services are open to the public".  *Magee*, 833 F.3d at 532.  Because Plaintiffs do

**DEFENDANT'S MOTION TO DISMISS – Page 22**

not plausibly allege that MyChart is a place of public accommodation, their ADA claim should be dismissed.

### B.      Plaintiffs' Claim Under the Rehabilitation Act Fails (Count VIII).

Section 504 of the Rehabilitation Act also does not apply here.  Section 504 applies to entities that "receiv[e]" federal funds.  *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997).  But here, Plaintiffs do not allege that Epic receives federal funds.  Instead, they allege that Epic "benefit[s] substantially" from federal funds received by others—namely, healthcare providers that receive federal funds and allegedly use such funds to, in part, buy Epic products.  (¶¶ 106, 108.)  That is not enough:  Section 504 "covers those who receive the aid, but *does not extend as far as those who benefit from it*".  *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607 (1986).  Because Plaintiffs do not allege that Epic itself receives federal funds from the government, this claim should be dismissed.

In addition, the individual Plaintiffs' Section 504 claims are time-barred.  The Rehabilitation Act does not itself "provide[] a limitations period"; courts instead "borrow the most analogous period from state law".  *Frame v. City of Arlington*, 657 F.3d 215, 236–37 (5th Cir. 2011).  And the most analogous period for Rehabilitation Act claims is "Texas's two-year personal-injury limitations period".  *Id.* at 237.  Section 504 claims accrue—*i.e.*, the clock starts ticking—"when the plaintiff becomes aware that she has suffered an injury".  *Bullock v. Univ. of Tex. at Arlington*, No. 22-10013, 2024 WL 637474, at *2 (5th Cir. Feb. 15, 2024).  Here, the individual Plaintiffs allege difficulty accessing their records in May 2021 and March 2023.  But

**DEFENDANT'S MOTION TO DISMISS – Page 23**

they did not file their Complaint until March 2026, long after the two-year window elapsed.[13]

(¶¶ 39, 198, 215.)  As a result, their Rehabilitation Act claim should be dismissed as time-barred.

### C.    There Is No Private Right of Action Under the Cures Act (Count IX).

Plaintiffs' claim under the Cures Act should be dismissed because the Cures Act does not

confer a private right of action.  A statute may confer a private cause of action explicitly or

implicitly.  *Alexander v. Sandoval*, 532 U.S. 275, 287–88 (2001).  The Cures Act does neither.

The text of the Cures Act does not explicitly confer a private right of action.  Nothing

about a private cause of action appears in the text of 42 U.S.C. § 300jj-52, and Plaintiffs fail to

identify any statutory provision authorizing private parties to bring suit for alleged information

blocking under the Cures Act.  (*See* ¶¶ 439–450.)

The Cures Act likewise does not implicitly confer a private right of action.  To implicitly

confer a cause of action, a statute's text and structure must "overcome the familiar presumption"

that Congress would not confer a private right of action by implication.  *Guardian Flight, L.L.C.*

*v. Health Care Serv. Corp.*, 140 F.4th 271, 275 (5th Cir. 2025).  Neither the text nor the structure

of the Cures Act overcomes this presumption.

The statute's text focuses on proscribing the conduct of regulated entities rather than

conferring rights on a protected class.  *See* 42 U.S.C. § 300jj-52(a)(1)–(2).  The Cures Act

defines "information blocking" as practices by health information technology developers,

exchanges, and networks that interfere with the access, exchange, or use of electronic health

information, and it directs its prohibitions at those actors.  *See id*.  By focusing on the regulated

---

[13] Because Texas suspends the statute of limitations for twelve months after the death of a potential plaintiff, Tex. Civ. Prac. & Rem. Code § 16.062, Mr. Miller's claim accrued in May 2021 and his representative had to sue by May 2024.  *See Hernandez v. Smith*, 793 F. App'x 261, 263 (5th Cir. 2019) (applying the twelve-month suspension to a federal claim).

**DEFENDANT'S MOTION TO DISMISS – Page 24**

entities rather than on any protected class, the statute "create[s] no implication of an intent to confer rights on a particular class". *Sandoval*, 532 U.S. at 289.

Furthermore, the statute's structure includes a comprehensive public enforcement mechanism: the Department of Health and Human Services ("HHS") is authorized to regulate, investigate, and penalize information blocking. *See* 42 U.S.C. § 300jj-52(b)(1)–(2). Congress directed HHS to implement regulations prohibiting information blocking and established an administrative regime for enforcement, including the authority to investigate information blocking and to impose civil monetary penalties for violations. *See id*. By specifying the means of enforcement, the statute "conveys Congress's policy choice to enforce the statute through administrative penalties, not a private right of action". *Guardian Flight*, 140 F.4th at 277.

Accordingly, every court that has examined this issue has found that the Cures Act does not confer a private right of action. *See, e.g.*, *McAllister v. Mansoor*, No. 2:25-CV-11965, 2026 WL 859806, at *5 (E.D. Mich. Jan. 20, 2026), *report and recommendation adopted*, 2026 WL 855154 (E.D. Mich. Mar. 27, 2026); *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 227–28 (4th Cir. 2025); *Intus Care, Inc. v. RTZ Assocs., Inc.*, No. 24-CV-01132-JST, 2024 WL 2868519, at *2 (N.D. Cal. June 5, 2024). Because the Cures Act provides no private right of action—explicit or implied—Count IX should be dismissed.

## CONCLUSION

For the foregoing reasons and because no amendment can transform these claims into cognizable causes of action, Epic respectfully requests that the Court grant this Motion to Dismiss in its entirety with prejudice. *See Wiggins v. La. St. Univ.—Health Care Servs. Div.*, 710 F. App'x 625, 628 (5th Cir. 2017) (affirming a dismissal with prejudice where "any attempt at amendment would be futile").

**DEFENDANT'S MOTION TO DISMISS – Page 25**

Dated:  May 15, 2026

Respectfully Submitted,

*/s/ Lauren A. Moskowitz*

Lauren A. Moskowitz (*Pro Hac Vice*)
Yonatan Even (*Pro Hac Vice*)
Noah Joshua Phillips (*Pro Hac Vice*)
Cravath, Swaine & Moore LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone:  (212) 474-1000
lmoskowitz@cravath.com
yeven@cravath.com
nphillips@cravath.com

*/s/ Christopher J. Schwegmann*

Christopher J. Schwegmann
State Bar No. 24051315
Lynn Pinker Hurst & Schwegmann, LLP
2100 Ross Avenue, Suite 2700
Dallas, TX 75201
Telephone:  (214) 981-3800
Facsimile:  (214) 981-3839
cschwegmann@lynnllp.com

*Attorneys for Defendant Epic Systems Corporation*

**DEFENDANT'S MOTION TO DISMISS – Page 26**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this filing via the Court's CM/ECF system per Local Rules CV-5 and CR-49 on May 15, 2026.

*/s/ Lauren A. Moskowitz*

Lauren A. Moskowitz
