UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

|  |  |
|---|---|
| The American Association for Disability Justice ("AADJ"), on behalf of its members and all others similarly situated; Larry Miller on behalf of the Estate of John Miller; and John Hodges; individually and on behalf of all others similarly situated.<br>Plaintiff,<br>　　　vs.<br><br><br>Epic Systems Corporation, and their affiliates, subsidiaries, and parent companies.<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.: 1:26-cv-00564-RP |

**PLAINTIFF'S RESPONSE TO DEFENDANT EPIC SYSTEMS CORPORATION'S MOTION TO DISMISS**

i

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................1

II. FEDERAL LAW AND NATIONAL HEALTH INFORMATION POLICY CONFIRM THE PLAUSIBILITY OF PLAINTIFFS' ALLEGATIONS.................................................3

A. Congress Deliberately Replaced Fragmented Medical Records with a National Interoperability Framework ......................................................................................3

B. Epic Voluntarily Became a Central Participant and Beneficiary of that National Interoperability Ecosystem .......................................................................................5

C. The Complaint Describes Real-World Barriers Experienced by Disabled Individuals ........6

III. PLAINTIFFS' COMPLAINT IS PLAUSIBLE UNDER RULE 12(b)(6) .........................6

A. Antitrust Claims Do Not Have a Heightened Pleading Standard .........................................6

B. Epic's Own Factual Admissions Reinforce Plaintiff's Complaint.......................................7

IV. PLAINTIFF PLAUSIBLY RAISED ANTITRUST CLAIMS............................................8

A. Plaintiff Plausibly Alleges a Relevant Product Market .......................................................8

1. Market Definition Is a Fact-Intensive Inquiry Rarely Resolved on the Pleadings ...............8

2. Rule 8 Expressly Permits Alternative Market Allegations...................................................9

3. Epic's Own Motion Demonstrates Why Market Definition Cannot Be Resolved Before Discovery .................................................................................................................10

4. Actual Market Realities Support Plaintiffs' Allegations.....................................................10

B. Plaintiff Plausibly Alleges Monopoly Power.....................................................................11

1. Epic Controls a Dominant Share of Accessible Electronic Patient Information .................11

2. Epic Benefits From Extraordinary Network Effects and Data Gravity ...............................12

3. Epic's Installed Base Creates Extraordinary Switching Costs and Lock-In ........................13

C. Plaintiff Plausibly Alleges Exclusionary Conduct.............................................................13

1. Microsoft Provides the Proper Framework for Evaluating the Challenged Conduct ..........14

2. Plaintiffs Do Not Assert a Duty-to-Deal Claim.................................................................15

3. Epic's Conduct Is Not Ordinary Product Innovation ............................................................15

4. Federal Interoperability Policy Demonstrates Why the Alleged Conduct Is Anticompetitive16

D. Plaintiff Plausibly Alleges Antitrust Injury and Causation..................................................17

1. The Complaint Alleges Injury to Competition Rather Than Individual Inconvenience......17

2. Delayed Social Security Disability Determinations Demonstrate Concrete Downstream
Competitive Harm...................................................................................................................18

3. Epic's Architectural Control Plausibly Caused the Alleged Competitive Injury.................19

V. CONCLUSION AND REQUESTS FOR RELIEF............................................................20

Certificate of Service ..............................................................................................................23

iii

# TABLE OF AUTHORITIES

## RULE 12(b)(6) / PLEADING AUTHORITIES

White v. U.S. Corr., LLC, 996 F.3d 302 (5th Cir. 2021)......................................................2

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)....................................................7–8

Ashcroft v. Iqbal, 556 U.S. 662 (2009)..........................................................................7–8

Fischman v. Epic Systems Corp., No. 3:26-cv-00770 (N.D. Tex.) ...............................8, 19

Dorsey v. Portfolio Equities, Inc., 540 F.3d 333 (5th Cir. 2008) .......................................8

Lovick v. Ritemoney Ltd., 378 F.3d 433 (5th Cir. 2004)....................................................8

## ANTITRUST AUTHORITIES

Particle Health Inc. v. Epic Systems Corp., No. 1:24-cv-07174-NRB (S.D.N.Y.) .........7, 9

Concord Assocs., L.P. v. Entertainment Properties Trust, 817 F.3d 46 (2d Cir. 2016) ......7

Todd v. Exxon Corp., 275 F.3d 191 (2d Cir. 2001)...........................................................9

Newcal Industries, Inc. v. IKON Office Solution, 513 F.3d 1038 (9th Cir. 2008).............9

Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451 (1992) ........9–10, 13

United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001)..............11, 12, 14, 17–18

Verizon Communications Inc. v. Trinko, LLP, 540 U.S. 398 (2004) ...............................15

Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group LP, 592 F.3d 991 (9th Cir. 2010) ......................................................................................................................15–16

Retractable Technologies, Inc. v. Becton Dickinson & Co., 842 F.3d 883 (5th Cir. 2016)15–16

## STATUTES, RULES, AND OTHER AUTHORITIES

21st Century Cures Act, 42 U.S.C. § 300jj-52.................................................................4

42 U.S.C. § 300jj-52(a)(1) .............................................................................................4

42 U.S.C. § 12101(a) .....................................................................................................6

29 U.S.C. § 701..............................................................................................................6

HITECH Act, Pub. L. No. 111-5 .....................................................................................4

42 C.F.R. Part 495..............................................................................................................4

75 Fed. Reg. 44314 ...........................................................................................................4

Fed. R. Civ. P. 8.......................................................................................................7, 9, 20

Fed. R. Civ. P. 8(d)(2)-(3)..............................................................................................9–10

Fed. R. Civ. P. 12(b)(6)..........................................................................2–3, 6–8, 13, 20

Fed. R. Civ. P. 15(a)(2)..............................................................................................20–21

Fed. R. Civ. P. 26...........................................................................................................3, 21

Abulibdeh et al., PLOS Digital Health (2026)...................................................................11

SSA OIG Audit A-01-18-50342 (2022) .............................................................................18

## I. INTRODUCTION

This case presents a narrow procedural question with significant practical consequences: whether the Court should dismiss, before discovery, a complaint plausibly alleging that the nation's leading electronic health information platform substantially contributes to barriers preventing disabled individuals and their authorized representatives from obtaining timely access to medical records necessary for healthcare and Social Security disability benefits.

Epic repeatedly conflates EMRs with EHRs, enterprise software with interoperability services, hospitals with patients, purchasers with consumers, and competitors with intended beneficiaries. (Dkt. 16 at 2-3, 6, 9-10). Epic misuses HIPAA rules to explain not sharing a patient's (the person HIPAA is supposed to protect) own EHR to the patient. Epic further tries to pass responsibility solely to providers. (Dkt. 16 at 2-3). All of Epic's explanations create disputed facts that cannot be resolved on a Rule 12(b)(6) motion.

Yet, Epic asks the Court to resolve factual disputes at the motion to dismiss stage, by accepting Epic's own characterization of its technology, architecture, interoperability framework, and role in patient access. According to Epic, it merely licenses passive software, providers exclusively control patient access, providers alone determine authentication procedures, and Epic bears no meaningful responsibility for the nationwide electronic health information architecture that it designed, markets, and maintains. (Dkt. 16 at 2-3).

However, Plaintiff's complaint alleges that Epic designed and governs an interoperability ecosystem that substantially influences how a class of patients (disabled individuals) and their proxies (parents, caregivers, guardians, and their estates) retrieve, authenticate, exchange, and assemble medical information across multiple providers. (Dkt. 1 at ¶s 357 and 1-3). Plaintiffs further allege that Epic's provider-specific portal architecture, authentication requirements, interoperability decisions, and technical governance preserve fragmentation and create

substantial barriers for disabled individuals seeking access to their own health information. (Dkt. 1 at ¶ 110).

Epic repeatedly argues that it has a passive role in EHR transmission, while affirmatively representing in its own motion that it is the national leader in Social Security Administration electronic medical record exchange, that it facilitated approximately 2.7 million electronic record transmissions to the Social Security Administration in 2025, that it has participated in electronic Social Security exchanges since 2011, and that it was the first and remains the only electronic health record company connected to the Social Security Administration through the Trusted Exchange Framework and Common Agreement ("TEFCA"). (Dkt. 16 at 1 and 7). Epic further emphasizes its leadership in nationwide interoperability and health information exchange.

The Federal Rules do not permit dismissal simply because a defendant offers a competing technical narrative. Rule 12(b)(6) requires the Court to accept Plaintiffs' well-pleaded factual allegations as true and draw all reasonable inferences in Plaintiffs' favor[1]. Whether Epic's characterization of its architecture ultimately proves correct is a question for discovery not for resolution on the pleadings.

Epic erroneously alleges that this case is about compelling Epic to redesign software or imposing liability merely because it developed a successful electronic health record platform. (Dkt. 16 at 16). Plaintiffs plausibly allege anti-competitive and exclusionary conduct occurring within the nation's evolving interoperability framework and are entirely consistent with Congress's longstanding policy favoring patient access, electronic health information exchange, and the elimination of unnecessary barriers to authorized retrieval.

---

[1] *White v. U.S. Corr., LLC*, 996 F.3d 302, 306–07 (5th Cir. 2021): The court must "accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff."

Epic's Motion ultimately asks the Court to accept Epic's description of its own technology over Plaintiffs' well-pleaded allegations. Because Rule 12(b)(6) requires the opposite, the Motion should be denied. Even if the Court concludes that additional factual allegations concerning Epic's architecture, interoperability framework, or technical governance would assist its analysis, dismissal with prejudice would remain inappropriate. Under Rules 15 and 26, the appropriate remedy is leave to amend or to allow targeted discovery, not dismissal.

## II. FEDERAL LAW AND NATIONAL HEALTH INFORMATION POLICY CONFIRM THE PLAUSIBILITY OF PLAINTIFFS' ALLEGATIONS

This case arises within a healthcare system that Congress has spent more than fifteen years attempting to transform from fragmented provider-specific medical records into an interoperable national health information infrastructure centered on patient access, authorized electronic exchange, and longitudinal health information retrieval.

The Complaint therefore does not present a dispute over ordinary software design or private business preferences. It arises directly from a comprehensive federal policy encouraging interoperable electronic health information systems that allow patients, caregivers, authorized representatives, healthcare providers, and government agencies to securely exchange medical information across organizational boundaries.

Viewed against that statutory and regulatory framework, Plaintiffs' allegations are not only plausible, they are precisely the type of issues Congress anticipated would arise as electronic health information became an essential component of healthcare delivery and public benefits administration.

### A. Congress Deliberately Replaced Fragmented Medical Records with a National Interoperability Framework.

3

Congress enacted the Health Information Technology for Economic and Clinical Health ("HITECH") Act to accelerate nationwide adoption of certified electronic health record technology through the Medicare and Medicaid Electronic Health Record Incentive Programs, commonly known as the "Meaningful Use" programs[2].

The objective of those programs was not simply to replace paper charts with electronic files. Congress sought to improve quality of care, increase patient engagement, enhance coordination among providers, and facilitate secure electronic exchange of health information through interoperable certified electronic health record systems[3].

Congress later expanded those objectives through the 21st Century Cures Act ("The Cures Act"), directing federal agencies to promote interoperability, discourage information blocking, and ensure that patients have timely electronic access to their health information[4].  The Cures Act specifically identifies practices that interfere with or materially discourage the access, exchange, or use of electronic health information as contrary to federal policy[5].

The Office of the National Coordinator for Health Information Technology ("ONC") implemented those directives through interoperability regulations and the Trusted Exchange Framework and Common Agreement ("TEFCA"), creating a nationwide governance structure intended to facilitate secure health information exchange among providers, patients, government agencies, authorized representatives, and approved participants.

---

[2] *Pub. L. No. 111-5, 123 Stat. 115 (2009).*
[3] *See 42 C.F.R. Part 495; 75 Fed. Reg. 44314 (July 28, 2010).*
[4] *42 U.S.C. § 300jj-52.*
[5] *42 U.S.C. § 300jj-52(a)(1).*

Federal guidance likewise recognizes Individual Access Services, patient-directed exchange, and authorized representatives as essential components of modern electronic health information systems.

Taken together, these statutes and regulations establish a clear and consistent national policy: healthcare information should move securely and efficiently with the patient rather than remain isolated within disconnected provider-specific systems. Interoperability is therefore not merely a private software preference. It is a central objective of federal healthcare policy.

**B. Epic Voluntarily Became a Central Participant and Beneficiary of that National Interoperability Ecosystem.**

Epic did not passively observe this federally encouraged transformation of healthcare. Epic voluntarily participated in the certification process, benefited from widespread adoption of federally certified electronic health record technology, and now publicly represents itself as a nationwide leader in interoperability and electronic health information exchange. Indeed, Epic's Motion emphasizes it is a nationwide leader in interoperability that it was the first and remains the only electronic health record company connected to the Social Security Administration through TEFCA (Dkt. 16 at 7).

Epic's success did not occur in isolation from federal policy, but rather because of it. Hospitals and health systems adopted certified electronic health record technology in substantial part because Congress encouraged interoperable electronic exchange through HITECH, Meaningful Use incentives, and subsequent interoperability initiatives. Epic voluntarily became now publicly promotes itself as a company that connects healthcare, facilitates nationwide exchange, and places patients at the center of electronic health information.

Against that backdrop, Epic now asks this Court to conclude that it merely licenses passive software and exercises no meaningful influence over patient access, interoperability architecture, authentication systems, application programming interfaces, or electronic health information exchange. Plaintiffs plausibly allege otherwise.

**C. The Complaint Describes Real-World Barriers Experienced by Disabled Individuals.**

The injuries alleged in the Complaint are not abstract disagreements over software architecture. They are the practical consequences experienced by disabled individuals who must assemble years of medical records from multiple hospitals, specialists, behavioral health providers, imaging centers, and primary care physicians in order to obtain healthcare, Social Security disability benefits, accommodations, or other essential services.

Federal disability policy has long recognized that technological barriers may prevent individuals with disabilities from meaningfully accessing programs and services that have become integral to modern life[6]. The Complaint describes precisely those practical barriers.

Plaintiffs do not rely upon HITECH, the 21st Century Cures Act, TEFCA, the Americans with Disabilities Act, or the Rehabilitation Act as independent causes of action. Instead, those statutes and regulations provide the factual and regulatory context within which Rule 12(b)(6) plausibility must be evaluated.

Each successive federal interoperability initiative sought to reduce barriers to entry, lower switching costs, promote patient-directed exchange, and increase competition. The Complaint plausibly alleges that Epic responded by maintaining proprietary architectural barriers that preserved its monopoly power notwithstanding those pro-competitive federal initiatives.

---

[6] *See 42 U.S.C. § 12101(a); 29 U.S.C. § 701.*

6

### III. PLAINTIFFS' COMPLAINT IS PLAUSIBLE UNDER RULE 12(b)(6)

**A. Antitrust Claims Do Not Have a Heightened Pleading Standard.**

A motion under Rule 12(b)(6) tests the legal sufficiency of a complaint; it does not authorize a court to resolve disputed questions of fact or determine whether a defendant's competing factual explanation is ultimately more persuasive. To survive dismissal, a complaint need only contain sufficient factual matter to state a claim that is plausible on its face[7]. Plausibility is not probability, and Rule 8 requires only enough factual content to permit the reasonable inference that the defendant is liable[8].

The recent decision in *Particle Health Inc. v. Epic Systems Corp.* is particularly instructive. Confronted with substantially similar arguments from Epic, the court emphasized that: "there is no heightened pleading standard in antitrust cases"[9]. Plausibility does not require probability or evidentiary proof. Rather, it requires only enough factual content to permit a reasonable inference that Defendant is liable[10]. The Complaint easily satisfies that standard.

**B. Epic's Own Factual Admissions Reinforce Plaintiff's Complaint.**

Epic's Motion presents at least four competing factual narratives: (1) Epic is the nationwide leader in interoperability; (2) Epic does not participate in the relevant interoperability market; (3) providers independently control access and architecture; and (4) Epic's architecture is merely provider-specific software. Whether those narratives are consistent, whether they accurately describe Epic's products, and whether they undermine Plaintiff's alleged market are factual questions that cannot be resolved on a Rule 12(b)(6) motion. The existence of multiple

---

[7] *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).*
[8] *Fed. R. Civ. P. 8 and Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).*
[9] *Particle Health Inc. v. Epic Systems Corporation, No. 1:24-cv-07174-NRB (S.D.N.Y.) citing Concord Assocs., L.P. v. Ent. Properties Tr., 817 F.3d 46, 52 (2d Cir. 2016).*
[10] *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).*

competing market descriptions confirms, not defeats, the plausibility of Plaintiff's allegations and demonstrates why discovery is required.

Despite Epic's introduction of innumerable and sometimes contradictory facts, they repeatedly ask the Court to do what Rule 12(b)(6) expressly prohibits: accept Epic's version of the facts while rejecting Plaintiffs' well-pleaded factual allegations. That is not the pleading standard established by the Federal Rules.

The recent decision in *Fischman v. Epic Systems Corp.* illustrates why Epic's Motion fails. Here, the court refused to credit Epic's competing factual narrative, explaining that although Epic offered "its own view of how its EHR software operates," the court would consider only the well-pleaded allegations contained in the complaint[11]. The same principle controls here.

Epic's Motion does not expose pleading deficiencies. Instead, it presents competing factual narratives. Under Rule 12(b)(6), *Twombly*, *Iqbal*, and *Fischman*, those factual disputes must be resolved through discovery, not dismissal.

### IV. PLAINTIFF PLAUSIBLY RAISED ANTI-TRUST CLAIMS

**A. Plaintiff Plausibly Alleges a Relevant Product Market.**

**1. Market Definition Is a Fact-Intensive Inquiry Rarely Resolved on the Pleadings.**

---

[11] *Fischman v. Epic Systems Corporation, 3:26-cv-00770 (N.D. Tex.) stating: In reaching the conclusion that Fischman has plausibly pleaded the duty element of her claim, the court accepts as true, as it must, the well-pleaded allegations of her amended complaint. See Lovick, 378 F.3d at 437. Although Epic offers its own view of how its HER software operates and the degree of ongoing control that it exercises, the court considers only the well-pleaded facts in the amended complaint. See Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008).*

Epic devotes a substantial portion of its Motion to arguing that Plaintiff identified the wrong market, excluded substitutes, misunderstood interoperability, mischaracterized MyChart, and improperly grouped related products and services. Those arguments do not demonstrate that Plaintiff failed to plead a relevant market. They demonstrate that Epic disputes Plaintiff's factual allegations and advances its own competing factual theory. (Dkt. 16 at 15).

The recent decision in *Particle Health Inc. v. Epic Systems Corp.* is particularly instructive. Confronted with substantially similar arguments from Epic, the court emphasized that: "market definition is a deeply fact-intensive inquiry" and therefore courts "hesitate to grant motions to dismiss for failure to plead a relevant product market"[12]. Rather than accepting Epic's competing facts, the court concluded that those issues should be addressed through factual development and observed that: "focused discovery should shed light on these issues and provide more clarity"[13]. The same reasoning applies here.

Courts have long held that dismissal for failure to plead a relevant product market is proper only if the complaint's market definition is facially unsustainable[14]. Additionally, Courts must consider the "actual market realities" given that "market definition is deeply fact-intensive"[15]. Given the intensive nature of market definitions, Epic's Motion should be denied.

**2. Rule 8 Expressly Permits Alternative Market Allegations.**

Epic repeatedly asserts that Plaintiffs must identify one exclusive market, one exclusive theory of liability, and one definitive description of Epic's interoperability architecture before

---

[12] *Particle Health Inc. v. Epic Systems Corporation, No. 1:24-cv-07174-NRB (S.D.N.Y.) citing Todd, 275 F.3d at 199-200 (citations omitted).*
[13] *Particle Health Inc. v. Epic Systems Corporation, No. 1:24-cv-07174-NRB (S.D.N.Y.).*
[14] *Newcal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).
[15] *Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 482 (1992) and Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001).*

discovery. The Federal Rules impose no such requirement. In contrast, Rule 8 expressly permits parties to plead alternative and even inconsistent theories.[16]

Rule 8(d)(2) expressly provides that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically". Rule 8(d)(3) further provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency".

Accordingly, Plaintiffs plausibly allege related and overlapping product markets including the market for enterprise EHR systems used by hospitals and large health systems in the United States; and the market for interoperable access to electronic health records and medical record aggregation services that allow patients to retrieve medical records across multiple healthcare providers. (Dkt. 1 at ¶ 251).

### 3. Epic's Own Motion Demonstrates Why Market Definition Cannot Be Resolved Before Discovery.

Epic never identifies a single coherent market. Instead, Epic repeatedly shifts among multiple descriptions of its products and services. Epic alternately characterizes itself as a leader in interoperability, a leader in TEFCA participation, a primary source of medical records for SSA and a mere software vendor with no architectural control. (Dkt. 16 at 2-3, 6, 9-10).

Epic's own competing characterizations illustrate precisely why market definition cannot be resolved on the pleadings. Whether the relevant market is defined by enterprise software licenses, patient-directed electronic health information access, interoperability services, Individual Access Services, or longitudinal electronic health information exchange presents factual questions requiring discovery.

### 4. Actual Market Realities Support Plaintiffs' Allegations.

---

[16] *Fed. R. Civ. P. 8(d)(2)-(3).*

The Supreme Court has instructed courts to examine actual market realities rather than formalistic labels[17]. Patients do not choose the electronic health record platform used by hospitals. Patients cannot migrate years of medical treatment to competing interoperability architecture. Patients cannot meaningfully select alternative authentication systems after providers adopt Epic.

Instead, disabled individuals and their proxies remain dependent upon provider-selected interoperability architecture, application programming interfaces, authentication systems, proxy access procedures, and technical governance long after providers selected Epic. Those realities create substantial switching costs, network effects, and data gravity analogous to those recognized in *Eastman Kodak* and *United States v. Microsoft Corp[18]*.

Epic's own public representations reinforce those allegations. Epic affirmatively markets itself as the nation's interoperability leader, emphasizes TEFCA participation, promotes nationwide patient access, and highlights its role as the leading electronic interface with the Social Security Administration. Those representations plausibly support Plaintiffs' allegations that Epic substantially participates in and influences the market for patient-directed electronic health information access and authorized interoperability services[19].

**B. Plaintiff Plausibly Alleges Monopoly Power.**

**1. Epic Controls a Dominant Share of Accessible Electronic Patient Information.**

---

[17] *See Eastman Kodak*, 504 U.S. at 482.

[18] *See Eastman Kodak*, 504 U.S. at 482 and *United States v. Microsoft Corp.*, 253 F.3d 34, 49-55 (D.C. Cir. 2001).

[19] *See* https://www.epic.com/epic/post/health-systems-on-epic-are-first-to-connect-with-the-social-security-administration-through-tefca/ *and* https://www.epic.com/epic/post/epic-previews-new-interoperability-features-for-patients-providers-and-developers/.

The Complaint alleges that Epic is the largest electronic health record vendor in the United States and that public estimates consistently place Epic's share of the acute-care electronic health record market at approximately forty percent or more, with more recent public analyses indicating that Epic's share may exceed fifty percent of the acute-care hospital beds[20]. But Plaintiffs' allegations do not depend upon any single percentage.

### 2. Epic Benefits From Extraordinary Network Effects and Data Gravity.

Epic's Motion largely ignores the economic realities of modern health information systems. Unlike ordinary consumer products, electronic health information accumulates over years or decades of treatment and becomes increasingly valuable as additional providers, specialists, laboratories, imaging centers, behavioral health providers, government agencies, caregivers, and authorized representatives depend upon the same interoperability architecture. This accumulated information creates significant data gravity.

As additional providers adopt Epic, additional patients become dependent upon Epic architecture. As additional patients accumulate records within Epic systems, additional providers, caregivers, attorneys, authorized representatives, and government agencies must interact with Epic interoperability architecture. As additional participants rely upon Epic interoperability, the value and influence of that platform increase.

These reinforcing network effects closely resemble those recognized in *United States v. Microsoft Corp.*, where the D.C. Circuit explained that widespread adoption and interoperability

---

[20] Abulibdeh, R., Crowson, M. G., Douglas, M. J., Ramos, M., Saillant, N. N., & Celi, L. A. (2026). A problem of Epic proportion. *PLOS Digital Health*, 5(3), e0001143. https://doi.org/10.1371/journal.pdig.0001143.

dependencies may substantially reinforce monopoly power and create significant barriers to entry[21]. The Complaint plausibly alleges comparable network effects here.

### 3. Epic's Installed Base Creates Extraordinary Switching Costs and Lock-In.

The Supreme Court has instructed courts to evaluate actual market realities rather than formalistic assumptions[22]. The actual market realities alleged in the Complaint strongly support monopoly power. Hospitals may choose enterprise electronic health record platforms once.

Patients do not. Years later, patients (namely disabled individuals) remain dependent upon provider-selected interoperability architecture, authentication systems, application programming interfaces, identity verification procedures, proxy access rules, and technical governance.

They cannot meaningfully migrate decades of treatment history to competing interoperability systems. Nor can providers realistically replace enterprise electronic health record infrastructure after years of implementation, customization, training, regulatory compliance, and accumulation of longitudinal patient data. These practical realities create extraordinary switching costs and durable lock-in that reinforce Epic's market position independent of any single market-share statistic.

Whether Epic ultimately controls forty percent, fifty-two percent, or some other percentage of enterprise electronic health record licenses presents a factual question for discovery. Rule 12(b)(6) requires only plausibility, and Epic's own admissions reinforce that Plaintiffs have alleged far more than sufficient facts to satisfy that standard.

### C. Plaintiff Plausibly Alleges Exclusionary Conduct.

---

[21] *United States v. Microsoft Corp.*, 253 F.3d 34, 49-55 (D.C. Cir. 2001).
[22] *Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 473-77 (1992).*

Epic's Motion repeatedly attempts to recast this case as either an unprecedented "duty to deal" claim or an ordinary product-design dispute. (Dkt. 16 at 10-12.) The Complaint alleges neither.

Instead, Plaintiffs allege that Epic voluntarily chose to compete by marketing itself as the nation's interoperability leader, emphasizing nationwide electronic health information exchange, patient engagement, TEFCA participation, and Social Security Administration connectivity while simultaneously maintaining interoperability architecture, authentication systems, application programming interfaces ("APIs"), provider implementation standards, and technical governance that plausibly preserve fragmentation, reinforce network effects, impede patient-directed access, and maintain Epic's dominant position within a federally encouraged interoperability ecosystem. That is affirmative exclusionary conduct.

### 1. Microsoft Provides the Proper Framework for Evaluating the Challenged Conduct.

Epic asks the Court to categorize the challenged conduct as ordinary software design and therefore immune from antitrust scrutiny. The D.C. Circuit rejected that approach. In *United States v. Microsoft Corp.*, the court explained that exclusionary conduct cannot be reduced to formalistic categories because "the means of illicit exclusion, like the means of legitimate competition, are myriad."[23] The court further recognized that interoperability decisions, compatibility restrictions, APIs, technical architecture, and platform governance may collectively maintain monopoly power and impede competition even though they are implemented through technical design choices[24].

---

[23] *United States v. Microsoft Corp., 253 F.3d 34, 58 (D.C. Cir. 2001).*
[24] *Id. at 49-58.*

*Microsoft* therefore requires courts to examine the practical operation and competitive effects of platform conduct rather than simply accepting a monopolist's characterization of its own technology. That principle is directly applicable here. Plaintiffs plausibly allege that Epic simultaneously maintains interoperability architecture and technical governance that preserve fragmentation, reinforce network effects, and impede competing methods of patient-directed electronic health information access. Those allegations describe exclusionary conduct, not merely software design.

### 2. Plaintiffs Do Not Assert a Duty-to-Deal Claim.

Epic repeatedly characterizes Plaintiffs as competitors seeking compelled access to Epic's proprietary technology. (Dkt. 16 at 12). The Complaint alleges something fundamentally different. Plaintiffs are a class of patients and their proxies who attempting to obtain access to their own longitudinal electronic health information through the interoperability ecosystem that Congress encouraged and Epic voluntarily chose to build, market, and lead. Hospitals may purchase enterprise software licenses.

Patients are the everyday users and intended beneficiaries of that interoperability ecosystem. Accordingly, Plaintiffs do not seek mandatory licensing, compelled access to proprietary assets, or a judicially created obligation requiring Epic to transact with competitors. Instead, Plaintiffs challenge Epic's affirmative maintenance of interoperability barriers after Epic voluntarily chose to compete on nationwide interoperability and patient-directed electronic exchange. *Verizon Communications Inc. v. Trinko, LLP* therefore does not control[25]. This case concerns exclusionary platform conduct affecting patients and authorized representatives not compelled dealing among competitors.

---

[25] *Verizon Communications Inc. v. Trinko, LLP*, 540 U.S. 398 (2004).

15

### 3. Epic's Conduct Is Not Ordinary Product Innovation.

Epic principally relies upon *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP* and *Retractable Technologies, Inc. v. Becton Dickinson & Co.* to argue that antitrust law does not require firms to redesign products[26]. Plaintiffs agree with that proposition, but that is not the conduct challenged here. Plaintiffs do not allege that Epic violated the Sherman Act merely by introducing new software, declining to adopt Plaintiffs' preferred interface, or choosing one technical design over another.

Rather, Plaintiffs allege that Epic voluntarily chose to compete by publicly marketing nationwide interoperability, TEFCA participation, Social Security Administration connectivity, patient engagement, and seamless electronic health information exchange as defining characteristics of its platform while simultaneously maintaining interoperability architecture, authentication systems, API governance, provider implementation standards, and technical controls that plausibly preserve fragmentation and impede patient-directed interoperability. That conduct is materially different from the ordinary product redesign at issue in *Allied Orthopedic* and *Retractable Technologies*.

Under *Microsoft*, the relevant question is not whether the challenged conduct involves technology[27]. The relevant question is whether the conduct plausibly maintains monopoly power and excludes competition through technical architecture and platform governance. The Complaint plausibly alleges that it does.

### 4. Federal Interoperability Policy Demonstrates Why the Alleged Conduct Is Anticompetitive.

---

[26] *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group LP*, 592 F.3d 991 (9th Cir. 2010) and *Retractable Technologies, Inc. v. Becton Dickinson & Co.*, 842 F.3d 883 (5th Cir. 2016).
[27] *United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001).*

16

Congress spent more than fifteen years encouraging interoperable electronic health information systems through HITECH, Meaningful Use, the 21st Century Cures Act, Information Blocking provisions, and TEFCA. Those initiatives share a common objective: reducing technological barriers so that patients and authorized representatives may securely obtain and exchange longitudinal electronic health information regardless of where treatment occurred. Epic voluntarily participated in that federally encouraged ecosystem and publicly represents itself as the nation's interoperability leader.

Plaintiffs plausibly allege that Epic nevertheless maintains interoperability architecture, authentication systems, API governance, provider implementation standards, and technical controls that preserve fragmentation and impede the patient-directed interoperability those federal initiatives sought to promote. Whether those practices ultimately constitute legitimate innovation or exclusionary maintenance of platform dominance presents a factual question requiring discovery.

### D. Plaintiff Plausibly Alleges Antitrust Injury and Causation.

Epic argues that the Complaint alleges nothing more than isolated inconvenience experienced by a class of individual patients. That characterization misstates both the Complaint and antitrust law. The Complaint plausibly alleges injury to competition resulting from Epic's maintenance of architectural and interoperability barriers that reinforce network effects, increase switching costs, foreclose competing interoperability solutions, reduce innovation, and ultimately diminish patient choice throughout a federally encouraged nationwide health information ecosystem.

### 1. The Complaint Alleges Injury to Competition Rather Than Individual Inconvenience.

Plaintiffs do not allege merely that disabled individuals experience frustration while accessing electronic health information. Rather, Plaintiffs allege that Epic's interoperability architecture, authentication systems, application programming interfaces, provider implementation standards, and technical governance preserve proprietary fragmentation and impede competing methods of patient-directed electronic health information access. Those barriers affect millions of patient including disabled individuals. The resulting harm is therefore systemic rather than individualized.

As recognized in *United States v. Microsoft Corp.*, exclusionary platform conduct may injure competition by preserving network effects, reducing interoperability, discouraging competing technologies, and maintaining monopoly power through technical architecture rather than price increases alone[28]. The Complaint plausibly alleges precisely that type of competitive injury.

**2. Delayed Social Security Disability Determinations Demonstrate Concrete Downstream Competitive Harm.**

The Complaint also alleges concrete downstream consequences of reduced interoperability. Individuals applying for Social Security disability benefits frequently depend upon timely assembly of longitudinal medical records from numerous providers. When interoperability barriers require repeated authentication, provider-specific portals, duplicative identity verification, or fragmented record retrieval, the predictable result is delayed submission of medical evidence, delayed disability determinations, delayed administrative appeals, and delayed access to public benefits[29].

---

[28] *United States v. Microsoft Corp.* 253 F.3d 34, 58-79 (D.C. Cir. 2001).
[29] Soc. Sec. Admin. Office of Inspector Gen., *The Social Security Administration's Expansion of Health Information Technology to Obtain and Analyze Medical Records for Disability Claims*,

18

Those delays are not merely private injuries. They are foreseeable manifestations of reduced competition within the market for patient-directed electronic health information access and authorized interoperability services. The Complaint therefore plausibly alleges both competitive harm and concrete downstream injury.

### 5. Epic's Architectural Control Plausibly Caused the Alleged Competitive Injury.

Epic's motion rests on a false dichotomy: because providers retain some discretion over patient access and interoperability, Epic supposedly cannot exercise control over electronic health information exchange. A recent federal decision involving Epic rejects that premise. In *Fischman v. Epic*, decided on a Rule 12(b)(6) motion, the court accepted as plausible allegations that Epic maintains "exclusive and ongoing architectural control" over its electronic health record system, including the "database structure, medication record design, reporting frameworks, and system logic" governing how information is created, displayed, and used[30]. The court further accepted allegations that these architectural features are "inherent to the EHR system and cannot be modified by hospitals," thereby constraining downstream decision-making even where hospitals and physicians retain independent responsibilities[31]. The same principle applies here.

Plaintiff does not allege that Epic exclusively controls every patient record or every provider decision. Rather, Plaintiff plausibly alleges that Epic controls the architecture through which interoperability occurs. Provider discretion exists only within that architecture. Just as the

---

*Audit A-01-18-50342*, at 10 (Jan. 3, 2022),
https://www.oversight.gov/sites/default/files/documents/reports/2022-01/01-18-50342.pdf.
[30] *Fischman v. Epic Systems Corporation*, 3:26-cv-00770 (N.D. Tex.).
[31] *Fischman v. Epic Systems Corporation*, 3:26-cv-00770 (N.D. Tex.).

existence of physician judgment did not negate Epic's alleged architectural control in *Fischman*, the alleged existence of provider configuration choices does not defeat Plaintiff's allegations that Epic exercises market power by designing and maintaining the interoperability infrastructure that channels, limits, and conditions patient-directed electronic health information exchange. At the pleading stage, concurrent provider discretion is not inconsistent with Epic's architectural control; it is entirely compatible with it.

## V. CONCLUSION AND REQUESTS FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant Epic Systems Corporation's Motion to Dismiss in its entirety.

Plaintiff has plausibly alleged a relevant market, Epic's monopoly power, anticompetitive conduct, antitrust injury, and resulting damages sufficient to satisfy the liberal pleading standards of Rule 8 and survive a motion under Rule 12(b)(6)[32]. Rather than demonstrating any pleading deficiency, Epic's Motion repeatedly relies on competing factual assertions concerning the operation of MyChart, provider control, patient access, interoperability, and the structure of the electronic health information exchange market. Those factual disputes cannot be resolved at the pleading stage and instead confirm that this case presents fact-intensive questions appropriate for discovery and resolution on a developed evidentiary record.

Epic asks this Court to resolve disputed questions regarding interoperability architecture, market definition, provider control, API governance, authentication systems, and competitive effects before discovery has begun. Rule 12(b)(6) requires the opposite. Accepting the well-pleaded allegations as true, Plaintiffs have plausibly alleged monopoly power, exclusionary conduct, and antitrust injury. The Motion should therefore be denied.

---

[32] *Fed. R. Civ. P. 8 and Fed. R. Civ. P. 12(b)(6).*

Alternatively, if the Court concludes that any allegation is insufficiently pleaded, Plaintiff respectfully requests leave to amend pursuant to Rule 15(a)(2)[33]. Amendment should be freely granted when justice so requires, particularly where there has been no discovery, no scheduling order, no undue delay, no bad faith, and no showing of prejudice. Any perceived deficiencies identified by the Court can readily be cured through amendment.

In the alternative, if the Court concludes additional factual development is necessary before resolving issues raised by Defendant's Motion, Plaintiff respectfully requests leave to conduct limited jurisdictional or targeted factual discovery, or such other relief as the Court deems appropriate under Rule 26[34].

Finally, because the Complaint plausibly alleges Sherman Act violations and discovery is warranted, the Court need not reach Defendant's alternative arguments regarding Plaintiff's claims under the Americans with Disabilities Act, the Rehabilitation Act, or the 21st Century Cures Act at this juncture. Those statutory claims provide additional evidence of the public policies underlying Plaintiff's allegations and further support allowing this action to proceed on a full factual record.

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Deny Defendant Epic Systems Corporation's Motion to Dismiss;

2. Permit Plaintiff's Sherman Act claims to proceed to discovery;

3. Alternatively, grant Plaintiff leave to amend pursuant to Rule 15(a)(2) before any dismissal with prejudice;

---

[33] *Fed. R. Civ. P. 15(a)(2).*
[34] *Fed. R. Civ. P. 26.*

4.  Alternatively, permit targeted Rule 26 discovery regarding the factual issues raised by

    Defendant's Motion; and

5.  Grant such other and further relief as the Court deems just and proper.


                                    Respectfully submitted,

                                    s/ Maren Miller Bam
                                    Maren Miller Bam
                                    WSB: 42264
                                    Salus Law, PLLC
                                    723 The Parkway
                                    Richland, WA 99352
                                    Email: maren@salusdisability.com
                                    Telephone: (206) 485-4066
                                    Facsimile: 206-260-9136
                                    Counsel for Plaintiffs and Proposed Class

22

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this filing via the Court's CM/ECF system per Local Rules CV-5 and CR-49 on June 12, 2026.

Respectfully submitted,

s/ Maren Miller Bam
Maren Miller Bam
WSB: 42264
Salus Law, PLLC
723 The Parkway
Richland, WA 99352
Email: maren@salusdisability.com
Telephone: (206) 485-4066
Facsimile: 206-260-9136
Counsel for Plaintiffs and Proposed Class

23

24